UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

DERRICK REDD,

                                        Plaintiff,

    -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE
DEPARTMENT, NEW YORK CITY POLICE OFFICERS,
DETECTIVE EDWARD BALFE, DETECTIVE
RONALD WALDRON, DETECTIVE BILLY MILLAN, POLICE
OFFICER FRESNEL AND POLICE OFFICERS JOHN DOES

                                        Defendant(s).
----------------------------------------------------------------------X

**AFFIRMATION IN OPPOSITION TO
SUMMARY JUDGMENT MOTION
19-CV-2917 (RJD) (TAM)**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Please take notice that upon the annexed Reply to the People's Rule 56.1 Statement, dated August 4, 2022; the Statement of facts, dated August 4, 2022, the Declaration of Robert Kerrigan, dated August 4, 2022, with Exhibits; the Memorandum of Law, dated August 4, 2022; and upon all prior pleadings and proceedings, plaintiff Derrick Redd opposes the People's motion for summary judgment as questions of fact remain to warrant a trial with respect to the plaintiff's claims and for such other relief as the Court deems just and proper.

Please take further notice that the Peoples motion to have the claims against Police Officer Justinah McFadden and the John Doe officers dismissed are unopposed. Plaintiff Derrick Redd, ("plaintiff") by his attorneys, Kelly, Grossman & Kerrigan, LLP, files this opposition to the defendants City Of New York, New York City Police Department and New York City Police Officers,

Detective Edward Balfe, shield number 2035, Detective Ronald Waldron, shield number 2293,

Detective Billy Millan, shield number 6770:

Robert Kerrigan, Esq.
Kelly, Grossman & Kerrigan, LLC
*Attorneys for Plaintiff*
1248 Montauk Highway
West Islip, New York 11795
Telephone: (516) 686-6768
Facsimile: (516) 686-6771

## Table of Contents

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ............................................................................................................... 1

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT ..................... 8

SUMMARY JUDGMENT ................................................................................................................. 9

FALSE ARREST.............................................................................................................................. 10

PROBABLE CAUSE......................................................................................................................... 11

INFORMATION RELIED UPON BY THE PEOPLE TO ESTABLISH PROBABLE CAUSE ....................... 13

    The Victim's family's suspicions ............................................................................................. 13

    The Phone Records.................................................................................................................. 19

    Suspicious Behavior................................................................................................................ 22

    Other Potential Suspects........................................................................................................ 23

    The Failure to Search the Sim Card ........................................................................................ 25

    CHRONOLOGICAL TIMELINE OF LEADS.................................................................................. 28

    Timeline of Leads ................................................................................................................... 29

    His Presence at the Scene on Saturday Morning.................................................................... 30

    Saturday Afternoon................................................................................................................ 31

    No Forced Entry/Cleaning Solution........................................................................................ 32

    Cuts on His Hands................................................................................................................... 34

    Text Messages not Photographed .......................................................................................... 35

    Failure to Maintain the Phone/Spoliation .............................................................................. 38

    Data Session Initiated............................................................................................................. 40

    Essay and the Call-In Tip......................................................................................................... 43

    Jinnette Gerve ........................................................................................................................ 45

THE ARREST .................................................................................................................................. 53

POST – ARREST AND THE GRAND JURY PRESENTMENT ................................................................ 58

GRAND JURY.................................................................................................................................. 59

MALICIOUS PROSECUTION ........................................................................................................... 71

    a)   Initiation of the Prosecution ....................................................................................... 71

    b)   Termination in the Plaintiff's Favor ............................................................................. 72

c) Probable Cause .................................................................................................. 72

d) Malice.................................................................................................................. 72

QUALIFIED IMMUNITY ....................................................................................................... 74

FAIR TRIAL ........................................................................................................................... 76

## TABLE OF AUTHORITIES

Cases

107 S.Ct. 3034, 97 L.E.2d 523 ................................................................................................ 74

133 S. Ct. 2675 (2013) ............................................................................................................... 9

42 U.S.C. § 1983 ....................................................................................................................... 54

*Alcorta v Texas*, 355 U.S. 28 .................................................................................................... 61

*Allen v. Coughlin*, 64 F.3d 77 (2d Cir. 1995) ........................................................................... 9

*Anderson v. Creighton*, 483 U.S. 635 (1987) ......................................................................... 74

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................................ 10

*Baker v. McCollan*, 443 U.S. 137 (1979) ................................................................................. 27

*Binder & Binder PC v. Barnhart,* 481 F.3d 141 (2d Cir. 2007) .............................................. 10

*Boyd v. City of New York*, 336 F.3d at 78 ............................................................................... 72

*Brodie v. Fuhrman*, 07-CV-4212, 2010 U.S. Dist. LEXIS 30158, (E.D.N.Y. Mar. 29, 2010) ............ 27

*Broughton v. State*, 37 N.Y.2d 451 (1975) .............................................................................. 10

*Candelario v. City of New York*, No. 12-CV-1206 (LAP), 2013 U.S. Dist. LEXIS 48412 (S.D.N.Y. Mar. 29, 2013) ..................................................................................................................................... 46

*Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162 (2d Cir. 1991) ...................................... 10

*Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330 (4th Dep't 1980) ..................................... 73

*Costello v United States*, 350 U.S. 359, ........................................................................... 60, 61

*County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.E.2d 1043 (1998) 74

CPL 100.05 ................................................................................................................................ 60

CPL 190.25, subd 5 ................................................................................................................... 60

CPL 190.65, subd 1 ................................................................................................................... 60

CPL 210.30 ................................................................................................................................ 61

CPL 70.10, subd 1 ..................................................................................................................... 60

CPL art 190 ............................................................................................................................... 60

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001) ......................................................... 27

*Dufort v. City of New York,* 874 F.3d 338 (2d Cir. N.Y. October 27, 2017) ............................ 11

*Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012) .................................................................. 58

Fed. R. Civ. P. 56(a) .................................................................................................................... 9

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968) ............................... 10

*Fischl v. Armitage,* 128 F.3d 50 (2d Cir. 1997) ......................................................................... 9

*Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988). ............................................................ 54

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.E.2d 396 (1982) ........................... 74

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614 (2d Cir. 1996) ................................................. 9

*Holt v United States*, 218 U.S. 245 ......................................................................................... 61

*Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ........................... 74

*Husbands ex rel. Forde v. City of N.Y.,* 335 F. App'x 124 (2d Cir. 2009) ............................ 12, 70

*Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011) ................................................ 9

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ................................................ 58

*Jovanovic v. City of New York*, 486 F. App'x 149 (2d Cir. 2012) ................................... 76

*Keller v. Sobolewski,* 10-CV-5198 (FB) (RML), 2012 U.S. Dist. LEXIS 147395,(E.D.N.Y. Oct. 12, 2012).......................................................................................................................... 76

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 ................................................................ 12

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) ......................................... 72

*Lowth v. Town of Cheektowaga*, 82 F.3d at 573 ............................................................ 72

*Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) ..................... 74

*Manganiello v. City of New York*, 612 F.3d 149 ....................................................... 74, 75

*Martinez v. Simonetti, 202* F.3d 625 (2d Cir. 2000) ............................................... 12, 70

*Matter of Cunningham v Nadjari*, 39 NY2d 314 ........................................................... 62

*Matter of Gardiner*, 31 Misc 364 .................................................................................. 61

*Matter of Jaffe v Scheinman*, 47 NY2d 188................................................................... 61

*Morales v. Quintel Entm't, Inc.,* 249 F.3d 115 (2d Cir. 2001)........................................ 10

*Myers v United States*, 435 U.S. 944............................................................................. 62

*Napue v Illinois*, 360 U.S. 264...................................................................................... 61

*Nardelli v. Stamberg*, 44 N.Y.2d 500 ............................................................................ 73

*Panetta v. Crowley*, 460 F.3d 388 (2d Cir. N.Y. 2006) ............................................. 27, 58

*People v Bergerson*, 17 NY2d 398 ................................................................................ 61

*People v Creasy*, 236 NY 205........................................................................................ 61

*People v Cwikla*, 46 NY2d 434 ...................................................................................... 61

*People v Dunleavy*, 41 AD2d 717, affd 33 NY2d 573 .................................................... 60

*People v Geaslen*, 54 NY2d 510.................................................................................... 61

*People v Glen*, 173 NY 395 ..................................................................................... 60, 61

*People v Haney*, 30 NY2d 328 ..................................................................................... 60

*People v Howell*, 3 NY2d 672 ...................................................................................... 61

*People v Leary*, 305 NY 793.......................................................................................... 62

*People v Minet*, 296 NY 315 ........................................................................................ 61

*People v Robertson*, 12 NY2d 355................................................................................ 61

*People v Savvides*, 1 NY2d 554..................................................................................... 61

*People v Sexton*............................................................................................................ 61

*People v Sexton*, 187 NY 495........................................................................................ 61

*People v Tyler*, 46 NY2d 251......................................................................................... 62

*People v Valles*, 62 NY2d 36 ........................................................................................ 60

*People v. Pelchat*, 62 N.Y.2d 97 (N.Y. May 15, 1984).................................................... 62

*Pinsky v. Duncan*, 79 F.3d 306 (2d Cir. 1996)............................................................... 72

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000) .................................... 9

*Ricciuti v. New York City Transit Auth.,* 124 F.3d 123 (2d Cir. N.Y. August 21, 1997)............ 54, 72

*Rohman v. New York City Transit Authority*, 215 F.3d at 217......................................... 71

*Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.E.2d 277 (1991) ................. 74

*Simonson v Cahn*, 27 NY2d 1........................................................................................ 60

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) ........................................................... 10

*Smith v. Springer*, 859 F.2d 31 (7th Cir. 1988) ........................................................................... 54

Stansbury, 721 F.3d ................................................................................................ 12, 58, 70

*United States ex rel Moore v. Koelzer*, 457 F.2d 892 (3d Cir. 1972) ....................................................... 54

*United States v Basurto*, 497 F2d 781 .......................................................................................... 62

*United States v DeMarco* , 401 F Supp 505, affd 550 F2d 1224 ..................................................... 62

*United States v Estepa*, 471 F2d 1132 ........................................................................................... 62

*United States v Flaherty*, 668 F2d 566 ........................................................................................ 62

*United States v Kennedy*, 564 F2d 1329 ........................................................................................ 62

*United States v Umans*, 368 F2d 725 ........................................................................................... 60

*United States v. Almanzar*, 749 F. Supp. 538 (S.D.N.Y. 1990) ....................................................... 30

*United States v. Clark*, 754 F.2d 789 (8th Cir. 1985) ..................................................................... 30

*United States v. Di Re*, 332 U.S. 581 (1948) ................................................................................. 30

*United States v. Fisher*, 702 F.2d 372 (2d Cir. 1983) .................................................................... 30

*United States v. Hillison*, 733 F.2d 692 (9th Cir. 1984) ................................................................. 30

*United States v. Patrick*, 899 F.2d 169 (2d Cir. 1990) .................................................................. 30

*United States v. Rodriguez,* 1992 U.S. Dist. LEXIS 6280 ................................................................ 30

*United States v. Rogers*, 2000 U.S. Dist. LEXIS 742 ..................................................................... 30

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) ................................................................... 9

*Wu v. City of New York*, 934 F. Supp. 581 (S.D.N.Y. 1996) ........................................................... 30

*Zahrey v. Coffey*, 221 F.3d 342, (2d Cir. 2000) ............................................................................. 76

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DERRICK REDD,

Plaintiff,

   -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE
DEPARTMENT, NEW YORK CITY POLICE OFFICERS,
DETECTIVE EDWARD BALFE, DETECTIVE
RONALD WALDRON, DETECTIVE BILLY MILLAN, POLICE
OFFICER FRESNEL AND POLICE OFFICERS JOHN DOES

Defendant(s).

-------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
SUMMARY JUDGMENT**

**19-CV-2917 (RJD) (TAM)**

Dr. Marianne Hamel, who was employed as the City Medical Examiner at the office of the Chief Medical Examiner of New York City at the relevant time, testified at trial: "I found nothing in my autopsy that would be consistent with the time of death of 6am the previous day" (October 25, 2008) (TT, 1643:13,14). This fact is central to the claim.

Niasha Delain[1] did not die at 6am on Saturday, October 25, 2008. She died sometime after 11:30 that day. The Police Investigators knew this early on in the investigation. When their actions are reviewed with knowledge of this simple yet crucial fact, their actions are exposed as unreasonable. This critical information is then withheld from the Grand Jury and efforts were made to withhold it from the trial jury. Jinnette Gerve's incredible assertions, which contradict her earlier statements and conflict with the forensic evidence was taken at face value when reasonable officers should have known that further inquiry was required. Derrick Redd was

---

[1] Spelling copied from Notice of Death

their target; contradictory statements from key witnesses and crucial forensic evidence was ignored, resulting in his False Arrest, Malicious Prosecution and denial of a fair trial.

## SUMMARY JUDGMENT

The admissible evidence, when viewed in the light most favorable to Plaintiffs, permit a reasonable fact finder to hold that Defendant NYPD personnel falsely arrested, maliciously prosecuted and denied a fair trial to Derrick Redd.

As Defendants acknowledge, on a motion for summary judgment, the burden is on the moving party to demonstrate that there are no genuine issues of material fact, *See* Mem; Standard of Review (at pg. 9), which would entitle it to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012) (internal quotations omitted), *aff'd*, 133 S. Ct. 2675 (2013).

In considering the evidence, courts may not make credibility determinations, and they may not weight the evidence *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011), *quoting Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). "These determinations are within the sole province of the jury." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *see also Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997) (reversing grant of summary judgment, noting that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."). Rather, courts are required to "view the evidence in the light most favorable to the nonmoving party," *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995), and

to resolve all ambiguities and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

To defeat summary judgment, the evidence does not have to be conclusively established in plaintiff's favor. *Anderson,* 477 U.S. at 248-49, *quoting First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-89 (1968). "[R]ather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 248-49, *quoting First National Bank of Arizona,* 391 U.S. at 288-89. Summary judgment cannot be granted if "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007), if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party." *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001) (emphasis added). "The judge's inquiry . . . unavoidably asks whether reasonable jurors *could* find by a *preponderance of the evidence* that the plaintiff is entitled to a verdict." *Coach Leatherware Co. v. Ann Taylor, Inc.,* 933 F.2d 162, 167 (2d Cir. 1991) (emphasis added), *quoting Anderson,* 477 U.S. at 252.

## FALSE ARREST

1.      In order to state a claim for false arrest, plaintiff must prove all of the following four elements: (1) the defendant intended to confine him; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995); *Broughton v. State,* 37 N.Y.2d 451, 456 (1975).

2.      Putting aside the first three elements of the claim for purposes of this motion as the plaintiff served time in prison from November 17, 2008 through April 4, 2018 as a result of the actions at issue, plaintiff's false arrest claim will rise and fall on whether a reasonable fact finder could conclude that there was no probable cause to initiate the prosecution.

## PROBABLE CAUSE

3.      Both the People and the Plaintiff acknowledge that the False Arrest claim (as well as the Malicious Prosecution and Fair Trial claim) will rise and fall on whether a reasonable fact finder could conclude that prosecutors lacked probable cause to arrest and prosecute the plaintiff.

4.      In their Memorandum of Law, the People's main contention is that "there was ample probable cause to arrest the plaintiff for the murder of Niasha Delain and her unborn child". Beginning on page twelve of their Memorandum, they cite to:

a) Towanda Wimms' (the victim's mother) suspicions;
b) Shaqwanna Wimms' (the victim's cousin) suspicions;
c) The tumultuous nature of their relationship, including his sexual involvement with other women and an insurance scheme;
d) No evidence of forced entry and that the plaintiff had a key;
e) His denial of being present in Niasha's apartment in the hours before the murder;
f) The claim that he was lying about his whereabouts;
g) His presence near the scene 19 hours before the discovery of the crime scene;
h) Jinnette Gerve;
i) The lead detective's notice of "a cleaning solution he thought might be bleach";
j) Cuts on the plaintiff's hands (Id);
k) The plaintiff's call to his friends while the police were at the scene (Id);
l) The phone records (Id).

5.      The question before this Court is whether the evidence presented by the Defendants was sufficient to establish probable cause to arrest as a matter of law. *Dufort v. City of New York,* 874 F.3d 338, 349 (2d Cir. N.Y. October 27, 2017). That is, if this Court concludes

that a reasonable fact finder could possibly find that probable cause did not exist prior to arrest, the defendant's motion must be denied as questions of fact would remain.

6.      The plaintiff will present evidence showing the defendant's focused their investigation on the plaintiff to such an extent as to be unreasonable, contributing to and causing the constitutional deprivation. This focus on plaintiff led to the police ignoring facts in their possession that would cause any reasonable investigator to doubt the veracity of the information they eventually relied on to arrest and prosecute the plaintiff. Investigators were laser focused on Derrick Redd and ignored substantial amounts of information that should have alerted them that no probable cause existed and further investigation was warranted. The "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571

7.      The people argue:   A Court's "assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone". *Husbands ex rel. Forde v. City of N.Y.,* 335 F. App'x 124, 127 (2d Cir. 2009) (citing *Martinez v. Simonetti, 202* F.3d 625, 634 (2d Cir. 2000)) (Memo, pg. 11) and that "As the Second Circuit has stated, "(a) story is never a single chapter, it is the experience of the entire tale; the same is true of probable cause." See Stansbury, 721 F.3d at 93" (Memo, pg. 16)

8.      The plaintiff agrees. This case will eventually rise and fall with the presence or lack of probable cause and whether a reasonable fact finder could. At the summary judgment stage, the question is whether a reasonable fact finder could conclude that there was not probable cause. Each piece of information the People claim to have relied upon will be examined so the

Court may determine whether a question of fact exists as to the presence of probable cause to arrest and prosecute Derrick Redd at the time he was arrested.

**INFORMATION RELIED UPON BY THE PEOPLE TO ESTABLISH PROBABLE CAUSE**

9.      On page twelve (12) of the defendant's Memorandum of Law, the begin to submit to this Court the information and evidence obtained during the investigation that they argue established probable cause. They, of course, present all evidence relied on, but focus on Towanda Wimms and Jinette Gerve as the linchpins. They will all be addressed. It should be noted at the outset that the People's documentation of the evidence presented relies heavily on their Rule 56.1 Statements of Facts, many of which are refuted.

 **The Victim's family's suspicions**

10.      Shaqwanna Wimms told police that Niasha had only one boyfriend and that was Derrick Redd, that he drove a black BMW and worked in insurance. She told them It surprised her that Niasha got her own apartment and she figured Derrick had something to do with it[2]. She opined "Derrick killed her and the baby and that he planned this all along that's why he didn't buy her anything for the baby". She told police "Derrick was eleven years older than her and that he wasn't a nice guy. (DD5 29)

11.      The last statement is irrelevant. As to her first statement; police knew, or should have known, that Shaqwanna did not know the intimate details of her sister's life and that her statements could not be relied upon as the investigator's knew the victim had multiple potential paramours:

---

[2] It is unclear whether she meant he had something to do with getting the apartment or committing the crime

"Q Did you become aware as part of that continuing investigation that the deceased in this case had been involved in any relationships with any other individuals other than Derrick Redd of a personal boyfriend-type relationship?
A Yes, sitting here today, I remember two individuals.
Q And who is that, sir?
A One was the name that came up first, name of David; unknown last name. And another individual by nickname which I later learned the government name. But the nickname Essay. E-S-S-A-Y, I believe.
Q Was it David Johnson?
A Sir, I will be honest; I never learned the last name or the identity of the last name.
Q You never checked it out further, other than David last name unknown?
A Correct (TT, **Exhibit E** at 1288:11-22).
Q And you never asked the family members about the last name of David?
A Honestly, I don't remember if I did or I didn't (TT, **Exhibit E** at 1289:17-19).
Q Essay, that's a street name, not a last or first name?
A That's a street name. The furthest I went with that was computer checks (Milan TT, **Exhibit E** at 1288: 7-25).

Of course, the police investigators should have interviewed Shaqwanna and investigated the information provided, but the information she provided did not provide any basis for probable cause to arrest and prosecute Mr. Redd.

12.     Seretha Wimms, Ms. Delain's aunt, explained to the detectives that she had previously dated plaintiff and that in her opinion he was a manipulator, a scammer and a thief (**Exhibit Q**, DD5-30). She further explained that to her knowledge, plaintiff had paid for 3 abortions and wanted no part of having kids (Id). Of course, the police knew that Mr. Redd had a child, who was mentioned in the texts examined by Det. Milan (July 1, 2008, 2pm text, **Exhibit GG**). Seretha Wimms' opinions could not possibly be considered as part of a probable cause calculation without further inquiry.

13.     Towanda Wimms is the mother and grandmother of the victims. She discovered the body and was at the scene when police arrived. The image of that woman's anguish and

despair at that moment is unthinkable. It is perfectly understandable that the officers receiving information from her would be emotional. It is unavoidably human.

14.     Detective Milan was asked: Q- It's just that some cases, they hit you harder than others? A Yes, sir, absolutely, yes. Q Would you think that this was one of those cases for you? A -- Yeah . . . [t]his would be one of them (Depo, **Exhibit S** at 31:20-32:12).

15.     Officer Brown testified that he spoke to her at the scene: "The woman was crying hysterically. Her make-up was running, her eyes was were red. I thought she was the victim of the assault so I approached her. I asked her what the problem was, and -Did she respond to you? Yes, she did. She said -- she pointed to the gentleman, and she whispered to me, she said, "he killed my baby"[3] (TT **Exhibit K** at 120: 10-19).

16.     Such assertions about the father of the child should, of course, have caused the police to focus the investigation on Mr. Redd, as they did. It was reasonable to do so. But what followed was an investigation wherein the police had determined in their mind that the Plaintiff was guilty and set out to prove it, facts be damned.

17.     It is in moments like these, when investigating officers feel absolutely certain that a suspect is guilty, accumulate evidence inculpatory to their target to the exclusion of all other evidence and unreasonably interpret every piece of evidence in the fashion most detrimental to their target, that the Constitutional rights of individuals are most at risk and therefore the most critical moment for the judicial system to allow redress.

18.     The police investigation into Derrick Redd was so laser focused, it caused police investigators to ignore so many pieces of evidence that should have led them away from their

---

[3] P.O. Brown testified at the first trial but did not mention what Wimms allegedly said (TT, 941-942)

pre-determined target and to unreasonably accept as true information from unreliable sources that should have caused any reasonable investigator to know that further inquiry was required before an arrest and prosecution was initiated.

19.     Det. Milan was asked what the goal of a criminal investigation was? He responded: "The goal, sir, that I was always taught was to get to the truth. That was the goal, was just to get to the truth. You get to the truth and hopefully you solve the case by getting to the truth" (Milan depo, **Exhibit S** at 11:6-9).

20.     Here, the goal of the investigation was to get Derrick Redd. The investigation was focused on him to such a degree as to have affected the ability or desire of the investigators to even consider that he was not guilty and retained the right to liberty absent probable cause.

21.      Ms. Wimms opinions as to who killed her daughter is presented in the forefront of the defendant's argument regarding the presence of probable cause (Memo of Law, pg. 12). She told Det. Balfe that while in the apartment when the body was discovered, she thought Mr. Redd killed her daughter and the baby, that Redd was planning an alibi and that she believed Derrick was going to kill her too (**Exhibit Q**, DD5 36).

22.     Detective Milan was asked about his interview with Ms. Wimms, the victim's mom. He responded: "A - I recall the part that she obviously thought that he killed Niasha, but she felt strongly that Derrick killed her daughter and the baby (Depo, **Exhibit S** at 70:4-6).

23.     Ms. Wimms made her opinion about what happened to her daughter and grand-daughter very clear to the investigators. The police, at first glance, could reasonably conclude that Ms. Wimms had insight into what type of relationship her daughter had with Mr. Redd; that

she knew what kind of person Mr. Redd is, what he liked and disliked, where he worked and how he treated her daughter. That kind of insight can be invaluable to an investigation.

24.     She told police that at the scene: "He (Mr. Redd) came walking up to her and asked her about this guy that Niasha used to date called Essay. Ms. Wimms told Det. Milan this confused her as Niasha only dated him for a short while" (**Exhibit Q**, DD5-36). Ms. Wimms dismissal of Essay as a suspect was apparently enough for Det. Balfe and the police investigators as no effort was made to locate or question Essay (Balfe depo, **Exhibit T** at pg. 90; Waldron depo, **Exhibit U** at pg. 38; Milan depo, **Exhibit S** at pg 70,71).

25.     Despite her impassioned insights into the case, Ms. Wimms cannot have provided any probable cause to arrest Mr. Redd as she had never met him prior to the day of the murder. Never. Tawanda Wimms had never met the father of her grand-son up until the day he was murdered. Her suspicions should have been met with skepticism. Further inquiry was required.

26.     The police investigators knew that Ms. Wimms and the suspect were complete strangers prior to the arrest. Seretha Wimms told police: "Derrick never met Niasha's family and he wasn't wanted" (DD5-30). In fact, Seretha shared her theory as to why Derrick helped Niasha with the apartment: "Derrick felt he wouldn't see the baby if the baby was to live with Niasha's parents" (Id).

27.     Darnell Wimms was the victim's father. He was interviewed with his wife by Det. Milan in the precinct on October 27, Milan depo, 68:5-72:2. Det. Milan testified that Mr. Wimms believed the plaintiff killed his daughter but had no documentation of it (Id at 71). Mr. Wimms testified:

> Q-Did you ever meet the defendant Derrick Redd?
> A-No.

Q-Did he ever come to the house?
A-No.
Q-Did he ever introduce himself?
A-No.
Q-Did he ever call the house and speak to you?
A-No (TT, **Exhibit D** at 979:10-18).

28.     Towanda Wimms told police that while she was attempting to reach Derrick to inquire about her daughter's whereabouts, she didn't know his phone number, but retrieved it from her home phone's caller ID (**Exhibit Q**, DD5-15). She told police Redd responded to her text messages with: "To whom is calling" (Id) and that she responded "Niasha's mother is calling" (**Exhibit Q**, DD5 15). There is no familiarity there; they were strangers. Opinions from those without knowledge, however sympathetic, should not be accepted without further inquiry. Those opinions cannot be relied upon as a basis for probable cause.

29.     When Redd and the victim's mother finally understood who they were texting with, Derrick told Ms Wimms he was five minutes away (Id). Redd was asked: Q. Prior to this instance, had you ever had any communication with her before? A. No (Redd depo, **Exhibit R** at 39:24-40:1). Finally, the People acknowledge they had the information that the victim's mother and the plaintiff had never met (Memo of Law, footnote 2, pg. 3).

30.     While at the crime scene, Ms. Wimms told police that she had information placing the plaintiff at her daughter's apartment, the murder scene, the night before the body was discovered. She told police that on October 24, 2008, at 9:20pm, she called her daughter, Niasha Delain (**Exhibit Q**, DD5 15). She told police that during the conversation with her daughter, she heard a male talking in the background and asked her who was there? Wimms told police her daughter said Derrick was there (Id).

31.     Detectives Balfe and Milan were given this information prior to interrogating Mr.

Redd at the precinct on the night the body was discovered. They pounded Mr. Redd with the

information given to them by Ms. Wimms. Detective Milan's DD5 reports: "I informed Mr. Redd

that Niasha's mother was spoken to and she stated that on Friday night between the hours of

9:20pm and 9:50pm, she was on the telephone with Niasha and heard a males voice in the

apartment with her. When she asked Niasha who was there she stated Derrick was here. Mr.

Redd immediately became defensive and stated, "listen Detective, I know you are trying to do

your job but those people don't like me. I was not there"" (DD5-17).

32.     In their motion, the People point to this moment in the interrogation as evidence

"when plaintiff denied being near Ms. Delain's apartment at all in the two days before her body

was discovered, he was lying" (Memo of Law, pg. 13). The people conflate his denial of being

present on Friday night with his omission of his location on Saturday morning. Dets. Milan

(Depo, 66:20-24) and Balfe (depo, 56:4-7) both provide information that Mr. Redd was being

truthful about not being in the apartment on Friday night.

**The Phone Records**

33.     Detective Milan was asked if he had investigated the victim's phone records to

determine if Mr. Redd was at the apartment. He responded: "So, yes, I remember seeing the

cell phone records and documenting that the cell phone records indicated that the phone itself,

sir, was not at Niasha DeLain's residence. It was somewhere in the vicinity of Jamaica Avenue. I

know it's documented" (Milan depo, 66:20-24).

34.     His phone was not there, it was miles away (Id). Det. Balfe was able to prove

Derrick Redd and the victim were communicating by text during that period (Balfe depo, 54:8-

18).

35.     This confirmed that Ms. Wimms conversation with the victim on the night before

the murder had given police information that an unknown male, someone other than the

plaintiff, was in the apartment on the night before her body was discovered. His phone was in

the vicinity of Jamaica Avenue, miles away; the two were communicating by text during that

time. Therefore, Derrick Redd was not there on Friday night at 9:20.

36.     Despite knowledge that another male was in the victim's apartment hours

before the murder, Detective Balfe was asked: Q- What did you do to investigate whether there

was another person in the apartment during that period? A - "I didn't" (Balfe depo, 56:4-7).

37.     Despite knowledge that another male was in the victim's apartment hours

before the murder, Detective Milan was asked if he took any steps to follow up on whose voice

Niasha's mom heard at the apartment. He said he did not (Milan depo, 67:24-68:4).

38.     A reasonable factfinder could conclude that the information and opinions from

Ms. Wimms could not form or contribute to the basis for probable cause as she had not met

Mr. Redd prior to that day. A reasonable fact-finder could conclude that police, knowing that

she had no first-hand knowledge of plaintiff, should have considered that Ms. Wimms may have

held some bias against the man who had some kind of a relationship with her daughter,

certainly not boyfriend/girlfriend, but impregnated her, upset her daughter terribly on a regular

basis, had no intention of marrying her and never took the time to meet the family, and that

her bias made the information she provided suspect. A reasonable fact finder could conclude

that her statements and opinions should not have been taken at face value in a probable cause determination and that the failure to do so contributed to the arrest without probable cause.

39.     Det. Balfe testified about the plaintiff's characterization of his relationship with the victim: "She was just -- she was just some girl that he was seeing and got pregnant" (TT, **Exhibit D** at 1053:17,18). That cold synopsis, juxtaposed against the emotional pleas from the distraught mother must have had a profound impact on the police officers state of mind. Maybe that is understandable. But it does not obviate the investigating officer's duty to reasonably investigate leads, wherever they may take the investigation. Det. Milan testified that the goal of an investigation was "to get to the truth" (depo, 11:6,7).

40.     From the moment police investigators arrived at the scene, they became laser focused on the plaintiff to such a degree as to be unreasonable. The information the police received from Ms. Wimms was not reliable. Her opinions about Derrick's guilt cannot be relied upon as a foundation for probable cause as the police knew or should have known that she had never even met the plaintiff before. The one piece of evidence she provided to police that was verifiable (the Friday phone call) turned out to be false.

41.     The People acknowledge that the suspicions of the Delain family was "not sufficient in and of itself to establish probable cause to arrest plaintiff since none of them saw and/or heard anything directly implicating the plaintiff in the murder" (Memo of Law, pg. 12, 13). That is refreshing, but they certainly do spend an awful lot of time and energy asserting the critical nature of the information provided by them in the search for probable cause before acknowledging the obvious. Ms. Wimms' opinion and the information she provided did not and could not form the basis for probable cause. A reasonable fact-finder could conclude that the

people's reliance on her statements was unreasonable and contributed to the constitutional violation.

42.     Despite the People's acknowledgement that Ms. Wimms' suspicions were not sufficient in and of themselves to establish probable cause (Id), those suspicions certainly had an effect on the investigation. The fact that Ms. Wimms and Derrick Redd had never met each other prior to the murder would become vitally important as the investigation and prosecution of Derrick Redd continued.

**Suspicious Behavior**

43.     The People argue that they had evidence of "admittedly suspicious behavior" at the scene (Memo of law, pg. 13-14). The impressions of various investigators tell a different story.

44.     Lt. DiPetra saw the plaintiff at the scene and described his demeanor: "He was on his cell phone, what I would consider playing with his phone, very calm" (TT, **Exhibit K** at 85: 3-6).

45.     P.O. Brown was asked the same question: "He appeared a little bit nervous" (TT, **Exhibit K** at 124:18,19)

46.     Det Balfe opined as to his demeanor at the scene: "He was just standing there" (TT **Exhibit L** at 265: 22). At the precinct, Det. Balfe described him as visibly shaken with tears in his eyes (**Exhibit Q**, DD5 18).

47.     Detective Milan was asked how he appeared. "He appeared fine" Q- Not emotional? A – "Not that I recall, sir, no" (TT, **Exhibit O** at 629: 21-24).

48.     Ms. Wimms testified: he looked regular (GJ, **Exhibit EE** at JC13, 11-13) and that he showed no emotion at all (Id, JC14:9-15).

49.     The police do not describe which version of his behavior they considered suspicious, but with so many various versions, it cannot be a contributing factor to a probable cause calculation. It is an example of the police investigators construing each piece of evidence involving Derrick Redd in the most damaging way possible. They continue to do so today when they argue his "suspicious behavior" at the scene contributed to probable cause (Memo of Law, pg., 13,14).

### Other Potential Suspects

50.     When police investigators learned through the phone records that Mr. Redd was not at the apartment on Friday night, they made no attempt to follow up when a reasonable investigator would have done so. Their reliance on Ms. Wimms' dismissal of Essay as a suspect and her lack of knowledge about her daughter's paramours (**Exhibit Q**, DD5-36), could lead a fact finder to conclude that the failure to even inquire contributed to the constitutional violation of arresting and prosecuting Derrick Redd without probable cause.

51.     As described above (Balfe depo, **Exhibit T** at 56:4-7, Milan depo, **Exhibit S** at 67:24-68:4), the police made no effort to investigate who may have been in the apartment on Friday night. While both Balfe and Milan admitted the presence of another male in the apartment would be relevant to the investigation (Balfe depo, **Exhibit T** at 37:17-38:3)(Milan depo **Exhibit S** at 67:2-5- "His whereabouts would be relevant, absolutely"), they made no effort to investigate. Milan stated: 'Impossible to follow up on a voice, sir, right" (Milan depo **Exhibit S** at 67:24,25).

23

52.     It was not impossible to follow up on the voice. Police were aware the victim had

been rumored to have been involved romantically with men other than the plaintiff:

> "Q Did you become aware as part of that continuing investigation that the deceased in
> this case had been involved in any relationships with any other individuals other than
> Derrick Redd of a personal boyfriend-type relationship?
> A Yes, sitting here today, I remember two individuals.
> Q And who is that, sir?
> A One was the name that came up first, name of David; unknown last name. And
> another individual by nickname which I later learned the government name. But the
> nickname Essay. E-S-S-A-Y, I believe.
> Q Was it David Johnson?
> A Sir, I will be honest; I never learned the last name or the identity of the last name.
> Q You never checked it out further, other than David last name unknown?
> A Correct (TT, **Exhibit E** at 1288:11-22).
> Q And you never asked the family members about the last name of David?
> A Honestly, I don't remember if I did or I didn't (TT, **Exhibit E** at 1289:17-19).
> Q Essay, that's a street name, not a last or first name?
> A That's a street name. The furthest I went with that was computer checks. I later
> learned later only after the arrest was made, of a government name of possibly Essay
> (TT, **Exhibit E** at 1289:19,20).

53.     Police did not learn about Essay after the arrest. They knew about him prior to

arrest. Ms. Wimms told police about Essay at the scene, but she dismissed him as a suspect

(**Exhibit Q** DD5-36). Police were told about him on October 27 (**Exhibit Q**, DD5-47), two days

after the murder and well before the arrest. Det. Milan's attempts to dismiss the failure to

make any kind of investigation into someone who clearly was relevant to the investigation by

stating that police learned about him after the arrest, thereby dismissing the failure as

irrelevant to the probable cause calculation. However, his statement was false. Essay's name

would appear on multiple occasions.

54.     Ms. Wimms was not even asked about Essay. Milan was asked about his interview

with Ms. Wimms on the day of the murder. He was asked if he followed up on who Essay was:

> "A So me, per se, I did not follow up on who Essay was, sir. I did not.

Q That would be the lead detective's responsibility?
A Whether it would have been Balfe, the lead, or if someone else assisting would have been tasked with that. I don't want to just put it on Balfe, but it could have been someone else as well.
Q But he was lead detective?
A Yes, sir.
Q Did you ask her if Essay could have been the voice she heard in the background?
A I don't remember asking her that, no[4] (Milan depo, 70:16-71:5).

55.     The police investigators did not follow up on who David was or whether it was David who was in the apartment with the victim hours before her death:

Q Who is David Johnson?
A- I don't know.
Q-Did you make any investigation to find out who David Johnson was?
A No. (Balfe depo, 91:3-7).

56.     A reasonable fact finder could conclude that the failure to make further inquiry into the two men that Detective Milan was aware of as persons of interest was a contributing factor to the constitutional violation and that a question of fact remains as to the presence of probable cause.

**The Failure to Search the Sim Card**

57.     That is not the only lead the police investigators ignored. Det. Balfe was in possession of a Sim card that contained data from Redd's phone. He made no effort to investigate (Balfe Aff, **Exhibit FF**). However, during the leadup to the second trial after his first trial was overturned. At that time, Detective Balfe sought a subpoena to search the Sim card for data. He was asked about it:

Q - It's an application for a search warrant for a SIM card; is that a proper characterization of what Exhibit D is?

---

[4] "Well, I'm from old school. If you don't document it and -- technically if you don't document it, it didn't happen. I felt it was important to document" (Milan depo, 53:2-5).

A Yes.

Q Your affidavit is affixed to that as Exhibit A1 is that correct?

A Yes.

Q And looking at your affidavit on the final page it indicates that . . . your affidavit was signed on February 9, 2018, do you see that, is that correct?

A Yes.

Q In your affidavit in support of the search warrant in Paragraph 16 you indicate that your experience over many of these investigations as a detective with the New York City Police Department you believe that defendants often use their cell phones immediately before and after committing crimes to communicate with accomplices or victims, do you see that?

A Yes.

Q In Paragraph 18, you said that you believe there's reasonable cause to believe that the SIM card will contain messages and information relative to the investigation of the murder of Niasha Delain, do you see that?

A Yes.

Q And in Paragraph 19 you indicate that you know of no previous application that has been

made in this matter, do you see that also?

A Yes.

Q Okay. Would the contents of that SIM card be relative to your investigation of the murder

of Niasha Delain?

A It could be.


58.    The questioning continued:


Q When you came into possession of this SIM card in November of 2008, did you make any effort to find out what was on the SIM card?

A No, not at that time.

Q Okay. Did you, in November of 2008, did you have reasonable cause to believe that the SIM card would contain text messages and other information relevant to the investigation?

A Possibly.

Q But, again, no application was made, is that correct?

A Correct.

Q All right. Is it possible that the SIM card could contain information about Mr. Redd's whereabouts on Friday evening between 9:20 and 9:50?

A Possibly.

Q Is it possible that the SIM card could have contained information about an alternative Suspect?

A Possibly.

Q Is it possible that the SIM card could have contained exculpatory information?

A – Yes

59.     Detective Balfe did none of that. He had the Sim card in his possession prior to

the initiation of the prosecution. He testified it could have had information about Redd's

whereabouts Friday night, early morning on Saturday and at the estimated time of death on

Saturday afternoon; that it could have contained information on Essay or any other possible

suspect. But it was not investigated at all while Detective Balfe was in charge of the

investigation.

60.     The plaintiff is well aware that an incomplete, incompetent investigation does

not, by itself, serve as the basis for a constitutional violation. The case law is clear: "Once a

police officer has a reasonable basis to believe there is probable cause to arrest, the officer is

not required to explore or eliminate every theoretically plausible claim of innocence before

making an arrest), *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979), *Panetta v. Crowley*, 460 F.3d

388, 395 (2d Cir. N.Y. 2006) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001))

(Nor does it matter that an investigation might have east doubt upon the basis for the arrest),

see also *Brodie v. Fuhrman*, 07-CV-4212, 2010 U.S. Dist. LEXIS 30158, at 24 (E.D.N.Y. Mar. 29,

2010) (an officer is not required to investigate exculpatory defenses offered by the person

being arrested or to assess the credibility of unverified claims of justification before making an

arrest).

61.     The plaintiff makes no claim that the failure to pursue any lead other than those

that targeted the plaintiff is the basis for a constitutional claim. The facts are presented as

evidence of the investigators state of mind during the investigation. The multiple failures during

the investigation could provide the basis for a reasonable fact finder to conclude that the police

investigators relied on information from witnesses to implicate the plaintiff without reasonable scrutiny while ignoring all evidence to the contrary without reason, which led to an arrest and prosecution without probable cause and the constitutional deprivation.

62.     The People argue that evidence of other possible suspects is "unsupported speculation" (Memo of Law, pg. 15) and conclude: "Moreover, according to Ms. Delain 's family, she was not seeing anyone else at the time nor did her phone records establish communication with anyone suspicious, let alone some ex-boyfriend" (Id). While it is true the family did say she was not seeing anyone else at the time of her killing, the police knew differently. It is another reason not to rely on their statements for probable cause. The People simply dismiss other possible suspects, but a fact finder might not. A reasonable fact finder might conclude that the investigation was so flawed as to constitute evidence that the police had unreasonably set their sights on one suspect to such an extent as to have contributed to the constitutional deprivation.

## CHRONOLOGICAL TIMELINE OF LEADS

63.     The two men who the police investigators identified as previous paramours of the victim (David Johnson and Essay), but who were not investigated are not the entirety of information the police had that should have led the investigation away from Derrick Redd. A quick synopsis of the timeline of information brought to the police will illustrate the importance of the next lead that would be presented to investigators.

**Timeline of Leads**

64.     Derrick Redd was taken to the precinct sometime around 10pm, in the moments after the body was discovered. He was interrogated for 25 hours (Balfe depo, **Exhibit T** at 57:2-5). He cooperated with police, answering all of their questions, allowing his car to be searched and allowing the detectives to examine and photograph his body. The police acknowledge that, at this point, they had no probable cause (Balfe depo, **Exhibit T** at 56:23-25).

65.     Police did not find any physical evidence connecting the plaintiff to the crime. They found no murder weapon, no eyewitnesses and no DNA connecting him to the crime.

66.     At the crime scene, on October 25, 2008, P.O. Beam asks the upstairs neighbor if she saw or heard anything. She told the office she did not know the apartment was occupied and has not seen nor heard any fighting in the apartment (**Exhibit Q**, DD5-7)

67.     On October 26, 2008, Medicolegal Investigator A. Donaldson provided an Initial Scene Investigation Report that described numerous stab wounds and a core rectal temperature of 84 degrees at 11:40 pm (**Exhibit V**). It had been 9.6 hours since her death, or approximately 2pm on October 25[5].

68.     On October 30, 2008, Detective Balfe himself spoke with the upstairs neighbor. She once again reported she heard and saw nothing (Balfe Notebook, **Exhibit X**).

69.     On November 3, 2008, Detective Milan receives a response to a subpoena from T-Mobile for the plaintiff's phone records.  Those phone records show Derrick Redd's phone was not anywhere near the victim's apartment on Friday night (**Exhibit Q**, DD5-55).

---

[5] Glauster Equation - Hours since death = 98.4-84/1.5=9.6 hrs.

70.     The phone records from the victim's phone, which the police were in possession of from the moment they arrived on the scene (Milan depo, **Exhibit S** at 95:6-9), show that a data session was initiated from the phone on October 25, 2008 at 2:10pm (**Exhibit Z,** Expert Report, pg. 7); that is, someone made the necessary keystrokes on the physical phone's keystrokes at 2:10pm on the 25th (Id, pg. 7).

71.     Susan Johnson, a manager within the Law enforcement Relations Group for T-Mobile testified at trial. Ms. Johnson acknowledged that the data transaction documented in the T-Mobile records that occurred at 2:10 pm on the 25th could have been "the customer was accessing the internet themselves" (TT, **Exhibit O** at 718:16-19). This time coincides with the Medicolegal Investigator A. Donaldson's Report estimating the time of death at 2pm (**Exhibit V** – used above also).

**His Presence at the Scene on Saturday Morning**

72.     Mr. Redd was at the scene on Saturday in the early morning hours. However, mere presence at the scene of a crime or association with a known or suspected criminal does not constitute probable cause *United States v. Di Re*, 332 U.S. 581, 593 (1948); *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990); *United States v. Clark*, 754 F.2d 789, 791 (8th Cir. 1985); *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984); *United States v. Almanzar*, 749 F. Supp. 538, 540 (S.D.N.Y. 1990). *United States v. Rodriguez,* 1992 U.S. Dist. LEXIS 6280.

73.     "In determining probable cause, facts relied upon must not be susceptible to innocent or ambiguous explanation." *Wu v. City of New York*, 934 F. Supp. 581, 586 (S.D.N.Y. 1996) (quotations omitted). *See also United States v. Fisher*, 702 F.2d 372, 375-77 (2d Cir. 1983) *United States v. Rogers*, 2000 U.S. Dist. LEXIS 742, *26-27. Here, Mr. Redd was near her apartment

between 2-5am because he thought she wanted him there on the due date, that he may have told her he was coming, that she threatened to leave the apartment on her own if her water broke, but he didn't go in because didn't want to get stuck staying the night (Redd depo, **Exhibit R** at pg. 13-18).

74.     There was some information gleaned from the phone records that police investigators refer to often and with great force in their argument that probable cause existed. Derrick Redd's phone records show that he was down the block from Niasha's apartment from 2:29am – 5:21 am on the morning of the 25th.

75.     Derrick acknowledged he did not tell police he was there during the interrogation at the precinct. He explained that he thought she wanted him there on the due date, that he may have told her he was coming, that she threatened to leave the apartment on her own if her water broke, but that he didn't want to get stuck staying the night (Redd depo, **Exhibit R** at pg. 13-18).

76.     He was there. However, police were aware it was over seven hours before the phone had been accessed (**Exhibit Z**) and the estimated time of death from the Donaldson Report (**Exhibit V**). It does not establish probable cause. The timeline just did not add up. Police knew where Derrick Redd was on Saturday afternoon at the estimated time of death and they knew it was nowhere near the crime scene.

### Saturday Afternoon

77.     Milan testified that he questioned Mr. Redd about his whereabouts during the day on Saturday, He recounted his steps, telling Milan (**Exhibit Q**, DD5-17) that he went to Brownsville, Five Towns and Queens, eventually meeting an ex-girlfriend, Shaqira Pollard, early

in the afternoon, around the time of the victim's death. He told Milan that when he left Pollard, he went to his father's house in Brooklyn (**Exhibit Q**, DD5-17).

78.     Days later, they sought to interview Ms. Pollard and Mr. Evans, without success. Mr. Redd told police he spoke with them on Saturday afternoon about the time of death (**Exhibit Q**, DD5-16). Derrick's father was interviewed to confirm Derrick's story (Balfe depo, **Exhibit T** at 59:20-60:2).

79.     Police eventually interviewed Ms. Pollard, who confirmed his presence during the crucial time period. Ms. Pollard gave a statement to police, telling them that Derrick came to the Hair Salon where she was on Saturday, October 25th, in the afternoon at around 1pm. This confirmed his presence away from the crime scene at the estimated time of death.

80.     The defendants did not produce a DD5, or any documentation at all, of the Pollard interview. But the interview did take place. Ms. Pollard's Affidavit, which is attached as **Exhibit KK**, states that she was at the precinct and answered questions from Det. Milan about her and Derrick's whereabouts on Saturday afternoon, October 25, 2008.

81.     A reasonable factfinder could conclude that the police did not document the interview as it would provide definitive proof that the plaintiff was nowhere near the scene at the estimated time of death and that the proof of his whereabouts was deliberately and maliciously withheld from the plaintiff. Derrick Redd was not near the scene at the time of death on Saturday afternoon.

### No Forced Entry/Cleaning Solution

82.     In the very first sentence of the People's argument that probable cause existed, they point to the fact that "there was no evidence of forced entry or theft at the crime scene

clearly suggesting that whoever was responsible was close to Ms. Delain or somehow had access to her apartment" (Memo of Law, pg. 12) and that the plaintiff had a key. Of course, police should have been aware that it is likely that any of the victim's possible paramours would have had a key and that a reasonable investigator could conclude that the police failure to consider or investigate that another person may have had a key may have led to the arrest and prosecution without probable cause.

83.     The People point to Detective Balfe's documentation on a DD5 that he smelled a cleaning solution upon entering the apartment (Balfe depo, **Exhibit T** at 23:2-8) and point to that as circumstantial evidence that "further enhanced defendants' probable cause that he was responsible" (Memo of Law, pg. 14).

84.     The attempted connection should be dismissed. The smell of cleaning solution is the result of the apartment being professionally cleaned shortly before the victim moved in.

85.     Officer Brown was one of the first to enter the apartment:

Q - When you entered that apartment, could you describe the condition of the apartment as you entered it, not the back bedroom but just the apartment itself as you entered?
A Well, it was pretty much pristine. It was nice and clean. It looked like it was newly renovated, you know, freshly cleaned up, and someone had just moved in or in the process of moving in (Brown TT, **Exhibit K** at 121:16-23)

86.     Detective Balfe was asked about it:

Q Derrick told you that he had somebody clean Niasha's apartment, do you recall that?
A Yes.
Q He indicated that person's name was Janice Robinson; do you recall that?
A I don't recall the exact name but I do recall that he had arranged to have the apartment cleaned.
 Q Did you confirm that she cleaned the apartment?
A I did not.
Q Do you know if anybody did?
A I don't recall. (Balfe Depo, **Exhibit T** at pg. 68:4-25)

87.     Any reliance on the smell of cleaning solution for probable cause must be rejected as the smell of cleaning solution resulted from the professional cleaning, which was never even investigated by Balfe. It is a perfectly reasonable explanation as Officer Brown explained. The victim's parents acknowledge she just moved into the apartment and the plaintiff gave police a name to verify that it was professionally cleaned. Balfe chose not to confirm with the cleaning lady.

**Cuts on His Hands**

88.     In that same paragraph, the People point to three cuts on Mr. Redds' hand as "[s]trong circumstantial evidence [that] further enhanced defendants' probable cause that he was responsible" (Memo of Law, pg. 12).

89.     The pictures lay rest to that argument. This was a violent murder, with 26 stab wounds. It was viscous and brutal, leaving the intestines of the victim and the fetus exposed. The cuts (**Exhibit AA**) are superficial and cannot in any way be used in a probable cause calculation for the brutal slaying, certainly not as a matter of law.

90.     Plaintiff's expert on police policy, Joseph Pollini explains: "I personally observed the pictures that were taken by Detective Waldron, of Mr. Redd's hands and they do not appear to have any significant cuts that would be indicative of a violent struggle. (**Exhibit Y,** Pollini Report). The cuts are superficial and would be found irrelevant by a fact finder. They must certainly be dismissed as a matter of law.

**Text Messages not Photographed**

91.     Next, the People point to the text messages uncovered by Det. Milan between the victim and the plaintiff, received by police on November 3, 2008, which the People describe as evidence of a tumultuous relationship and which uncovered an insurance fraud scheme that allegedly served as motive for the murder (Memo of Law, pg. 12).

92.     However, the treasure trove of information that the People point to as a result of the phone search was, in reality, cherry-picked messages between Redd and the victim. Detective Milan admittedly chose to photograph only those text messages between the victim and, according to police, the lone suspect.

93.     At trial, Detective Milan was asked whether he took possession of Niasha's phone:

Q - All right. Now, Detective, you indicated before that you had access to Niasha's phone that evening; is that correct?
A-Yes.
Q - And you indicated that you looked through the phone to see any text messages or call logs; is that correct?
A-That is correct.
Q - Did you find any text messages on that phone?
A- Yes.
Q - And what did you do with those text messages on the phone?
A - So approximately two to three days later from the date in question -- from October 25, 2008 -- I viewed every single text message, I photographed every single text message with a digital camera that was assigned to the Queens Homicide Squad. I then took the memory card out of that digital camera and I gave it to a Detective Ronald Waldron that was assigned to the Queens Homicide Squad and Detective Waldron was kind enough to print those photographs out for me and download them as well and record them onto a CD disk (TT, **Exhibit N** at 594:16-595:12).

94.     That testimony was false; he was asked about it during his deposition:

Q You took screenshots of communications between Niasha and Derrick; is that correct?
A Yes, sir.
Q-Did you take any screenshots of any other texts?

A - So, I mean the best way I could answer, anything that we have in the case file as far as pictures, screenshots taken of, is what I've got. If it wasn't photocopied if you will or printed out, I guess is the best way, then I didn't take it. Anything that I viewed -- safe to say, anything I viewed, I photographed and it was printed out.

Q Okay. You say anything you viewed. How did you come to view them? Were you going through her phone?

A Yes, sir.

Q - What were you looking for?

A - Any communication between her and Mr. Redd that would be of value.

Q Why was it that you weren't looking for her communications with anybody else?

A Honestly, because at that point in time, me, I could speak for me, I was focusing on her communication with Mr. Redd, Derrick Redd. I wasn't per se looking into her communication with anyone else. Now, anyone else, if I came across any communication with it would have been photographed and saved and photocopied, but my purpose was to look and identify to the best of my ability any communication she was having with Mr. Redd.

Q You said that was your responsibility or your goal? What was that?

A That was something that I did. It was an investigative step that I took. Responsibility, I don't know if that's the word, and goal. It's an investigative step that I took.

Q While you were taking that investigative step, was it your decision that you were going to focus on those two and you weren't going to look at other communications from Niasha?

A Again, I just want to be clear. I was focused on the communication between Niasha and Derrick, but if I would have came across any other communication, I would have also photographed it and saved it and obviously printed it out, but my main --as I sit here today, my main focus was the communication between Niasha and Derrick Redd.

Q Why was that your main focus?

A That was my main focus because Derrick Redd was the suspect -- full-blown suspect at this point in time, regarding this case.

Q Is it possible other communications or other texts from somebody else may have lead to other suspects?

A: Is it possible? Mr. Kerrigan, anything is possible, but as I sit here today, I don't recall coming across anything -- across any other communication, but is it possible that there could have been other communication between her and other people, yes, there's obviously a possibility there.

Q Okay, but what I'm trying to get at is there are about 300 photographs that you took that day and they are between Niasha and Mr. Redd. As you were looking through this phone, there was nobody else who Ms. DeLain had communicated with during that period?

A Again, as I sit here today, as far as texting and things that I documented through photographs and that, I'm going to have to say no, but if there was, I would have taken a photograph of it is what I'm trying to explain. Obviously, it's been like 13 years, but if I photographed it and depicted it with a picture and saved it and photocopied it, then it

would be there. I'm sorry if I'm not answering it, but I don't know what else I came across, right. Maybe I did photograph some other communication.
 Q But is it possible you came across something, decided to yourself this is not a relevant picture and moved on, trying to find communication between Niasha and Mr. Redd?
A Is that a possibility? possible, yes. To my knowledge, printed everything, so ... (Milan depo, **Exhibit S** at 99:11-17).

95.     A review of the phone records from T-Mobile (**Exhibit BB**[6]) shows there were eighty-two (82) text messages from persons other than the plaintiff on the victim's phone, in October alone. The defendants have produced the T-Mobile records, which were cross-referenced to the photographs that were presented to this court as a complete set. Eighty-two messages were documented by T-Mobile which were not produced to the Court or to the defendant (**Exhibit BB**, Highlighted text messages that were not photographed).

96.     Calls for production of the phone were made in an attempt to view those eighty-two messages. However, the Custodian of the Records for the Queens D.A. has admitted that the physical phone and the SIM card cannot be located (Plaintiff Request and Defendant Response, **Exhibit CC**). A reasonable factfinder could conclude that the missing text messages had information inculpatory towards another or exculpatory towards the plaintiff and the police investigator's decision to focus on the texts between Redd and the victim and exclude all others may have contributed to the constitutional deprivation. In any event, a relevant question of fact remains.

---

[6] The Courtesy Copy has the eighty-two texts where the contents were not photographed or documented highlighted.

**Failure to Maintain the Phone/Spoliation**

97.     The investigators were required to maintain the phone, but did not. When they had the phone, they failed to fully investigate the information available, focusing instead on the messages from the only person they cared to investigate, Derrick Redd. A reasonable fact finder could conclude that the failure to safeguard the phone and the treasure trove of data – was a contributing factor to the constitutional deprivation. Additionally, the Court might direct the fact finder to consider a negative inference for spoliation.

98.     Detective Milan's failure to photograph, document or maintain any of the text messages from the victim's phone was clearly an error, but it was a correctable error. The search of the phone and the T-Mobile records occurred on November 3, 2008. When no evidence was uncovered that resulted in probable cause to arrest Derrick Redd, the records and the phone were still available for further review. That did not occur.

99.     Plaintiff reviewed the T-Mobile records, which were cross-referenced against the photos of the text messages provided by Detective Milan. Eighty-two text messages on the victim's phone had not been photographed and produced from the month of October alone. There is no evidence they have been viewed by anyone other than Detective Milan (**Exhibit BB**, Highlighted text messages that were not photographed).

100.    We know this for two reasons: First, because Detective Waldron testified he copied only what was presented to him:

> Q Do you know if the pictures taken by Detective Millan represented all of the text messages that were on the phone?
> A I believe he took pictures of all the text messages. I couldn't tell you for sure. I don't know if they were just between the victim and Mr. Redd or if he took a picture of every text message. I could not tell you. I didn't review them. I didn't review them.

Q You just copied what Detective Millan gave you?
A Right. (Milan depo, **Exhibit S** at 40:6-16)

101.    Second, the defendant acknowledges: "no extraction report was done on the
decedent's phone" (11/22/21 Francolla letter to Judge Merkl, **Exhibit CC**). In that same letter,
despite the acknowledgement, the People continue the false narrative that "one of the
defendant's photographed the entirety of the text messages that were on it" (Id, pg. 2).

102.    The letter from counsel clearly illustrates the importance of both the records
maintained and the texts that cannot be recovered. In the same paragraph where "the entirety
of the text messages" were claimed to have been photographed, counsel acknowledges: "While
these records do not include the contents of text messages, they do contain every number that
the decedent communicated with during that period whether by call or text" (Id).

103.    Those eighty-two text messages were from family, friends and co-workers. They
may have contained information concerning the victim's multiple relationships, information
about her movements and visitors in her last hours, including who was in her apartment on Friday
night, just hours before her death.

104.    The Expert Report notes "the records could . . . have been obtained for two years
after the crime, but no one made the request or no one preserved the records", and opines,
"when devices communicate every key stroke, and all details of the communication are logged".
He concludes, "if the phone detailed records were collected and preserved, I could have also
given additional and more detailed opinions. If the People maintained the phone, we could have
known exactly what was done as far as data usage and internet activity and when and what was
viewed and accessed but now, we cannot as the phone not preserved" (Expert Report, **Exhibit
Z**).

105.   A reasonable factfinder could find that the failure to properly inspect the phone, to obtain an extraction report, to photograph all of the victim's text messages and to retain possession of the phone and the SIM card was another contributing factor toward the arrest and prosecution of Mr. Redd without probable cause. The phone could have contained exculpatory evidence in the form of data transmission and/or potential exculpatory evidence from the many text messages not examined. Certainly, they were not produced.

**Data Session Initiated**

106.   But there is more. The failure to properly inspect the phone would have further consequences. While details of the Medical Examiner's Report and the discrepancies in the time of death as reported by the Autopsy Report, there was exculpatory evidence on the victim's phone all along.

107.   Expert testimony from Mr. Keith Humanitzki (Expert Report, **Exhibit Z**) details that "a data session was initiated such as Internet access or checking emails on October 25, 2008 at 2:10 PM. This would have required a live person pick up the phone, actuate the mobile phone at the time, and select data services on the devices by typing the request on the phone's keyboard or scrolling through the necessary phone menu options and clicking the keystrokes necessary to initiate the data session".

108.   Susan Johnson, a manager within the Law enforcement Relations Group for T-Mobile was not asked about and therefore did not testify about the 2:10pm data session in the first trial. During the second trial, when Mr. Redd was acquitted, Ms. Johnson acknowledged that the data transaction that occurred at 2:10 pm and documented in the T-Mobile records could mean "the customer was accessing the internet themselves" (TT, **Exhibit O** at 718:16-19).

109.    Pursuant to the expert: whenever a new data session is initiated an IP address gets assigned by T-Mobile. The record indicates specifically IP address 216.155.161.248 was assigned on that date at a that time. Thus, a new data session was initiated at that date and time and on that device as can be seen clearly in the record (Expert Report, **Exhibit Z**).

110.    This information coincides with the 2pm time of death estimation from the Donaldson report. The investigators had the phone prior to arrest (See Milan TT **Exhibit N** at 595:4-7; see Francolla letter, **Exhibit CC**). Therefore, they had knowledge that the internet was accessed from the victim's phone at 2:10 pm. A reasonable factfinder could find that the failure to properly inspect the phone for outgoing messages was another contributing factor toward the arrest and prosecution of Mr. Redd without probable cause.

111.    At this point, the police have no physical evidence pointing to Mr. Redd from the crime scene or from his car, which he allowed to be searched. They had the suspicions of the family and the phone records which indicate that Redd was in the vicinity of the crime from 2:29am – 5:21am and indicate that he was not near the apartment after that on Saturday, including the period around 2pm, which is the time of death according to the Donaldson report and the victim's phone pinging to initiate a data session. The police had evidence of two possible paramours of the victim and text messages between Redd and the victim.

112.    As to the family member's suspicions, the People acknowledge "despite those suspicions, plaintiff was not arrested at that point" (Memo of Law, pg. 13). As to his presence at the murder scene in the early morning of Oct. 25, the People state in their Memo of Law: "Yet still, defendants did not arrest plaintiff and proceeded with their investigation (Id, pg. 13).

113.    With no probable cause at this point in the investigation, what did the police do? They executed a search warrant on Derrick Redd's father's home. "No evidence was recovered (**Exhibit Q**, DD5-40). On October 28, they executed a search warrant on Derrick's mother's home. No evidence was recovered (**Exhibit Q**, DD5-41). That same day, they executed a search warrant on Mr. Redd's vehicle. No evidence was recovered (**Exhibit Q**, DD5-42). They executed a search warrant on Mr. Redd's grandparent's home. No evidence was recovered (**Exhibit Q**, DD5-43). They canvassed for witnesses, including the upstairs neighbor, who told Detective Balfe on Oct. 30., "she heard and saw nothing" (Balfe Notebook, **Exhibit X**).  On October 31, Detective Milan examined the cell phone records from Mr. Redd's phone. He found six numbers of interest and sought, through subpoena, subscriber information for those numbers (**Exhibit Q**, DD5-48). That same day, they sought to interview Ms Pollard and Mr. Evans. Mr. Redd told police he spoke with them on Saturday afternoon about the time of death (DD5-16). They were not located (**Exhibit Q**, DD5-49). On Nov. 1, Det. Waldron and others continued canvassing the area near the murder and handed out Crimestoppers tip cards (**Exhibit Q**, DD5-50).  On Nov. 1, Det. Milan examined the victim's phone records. He documented calls between the victim and her office, Mr. Redd, her mother and her cousin. The last documented text occurred at 1:29pm. The 2:10pm data session, the one that the T-Mobile expert told the Court the session could mean "the customer was accessing the internet themselves" (TT, **Exhibit O** at 718:16-19), was not documented (**Exhibit Q**, DD5-52).

114.    A reasonable fact finder could/should find that no probable cause existed at this point in the investigation; that leads were drying up.

**Essay and the Call-In Tip**

115.    The police investigators had one lead that was not investigated. This lead came to

the police early in the morning on October 30, 2008. The lead came from someone who believed

her brother was in a relationship with the victim for one year, he could be the father of Niasha's

baby, the two had a recent altercation about the child and the caller was concerned that her

brother might be involved in the murder. The lead also stated the her the person suspected had

a street name of Essay.

116.    The crucial nature of the lead requires that it be presented in full. This is DD5-47:

> "On October 30, 2008, at approximately 0900 hours I did receive a
> phone call from Detective Batista from Crimestoppers. Detective
> Batista did state that he had a woman on the phone who had some
> information in regards to the homicide of Niasha Delain. I did get
> connected with a female who identified herself as Nancy Jackson.
> Nancy stated that she has a friend by the name of Belinda Dejesus
> (718)327-0636. Nancy stated that Belinda had told her that she
> believes that her brother Graig Dejesus, may have been involved in
> this homicide. I asked Nancy if Belinda had told her that Craig was in
> a relationship with Niasha. Nancy stated that Belinda had told her
> that Craig was seeing Niasha for about a year and the child was
> possibly Craig's child. Belinda stated to Nancy that she was highly
> concerned that her brother might be involved. Belinda had also told
> Nancy that Craig had a recent altercation with Niasha but was not
> sure what it was about but was possibly about the child Niasha was
> carrying. Nancy described Craig as a hispanic male in his early thirties.
> Nancy also stated that she does not have Belinda's address but know
> she lives somewhere in Bayswater. Nancy stated at the end of the
> conversation that Belinda has a boyfriend by the name of Manny
> Williams who goes by the street name of "sa" or "essay". Nancy
> described him as a male black unsure of his age" (DD5-47).

117.    The victim's mother told police that the victim dated Essay. Det. Milan testified he was aware that Niasha had a relationship with Essay (TT, **Exhibit E** at 1288:11-18). Milan would go on to testify that he didn't learn about Essay until after the arrest (TT, **Exhibit E** at 1288:25-1289:1). Of course, that is false. He interviewed Ms. Wimms on October 25 and got the lead on Oct. 30. The police investigators had the lead prior to arrest.

118.    In any event, the lead came in on October 30. The tunnel vision of the police investigation being focused on the plaintiff becomes clearly illustrated when the actions that the police took to investigate the lead are examined, with full knowledge that the police already possessed evidence of two possible paramours of the victim.

119.    First, as to Detective Milan:

Q - Did you follow up on who Essay was?
A - So me, per se, I did not follow up on who Essay was, sir. I did not (Milan depo, **Exhibit S** at 70:16-18).

120.    Second, as to Detective Balfe:

Q Who is Belinda DeJesus?
A-She was mentioned in a Crime Stoppers tip that was called into the police department. I never spoke to that person personally.
Q Okay. Did you speak with Belinda DeJesus' brother?
A No.
Q Do you know who Craig DeJesus is?
A No.
Q Greg DeJesus?
A No.
Q Sammy DeJesus?
A No.
Q Do you know if Belinda DeJesus was ever interviewed?
A Not to my knowledge.
Q - Do you know if Nancy Jackson was ever interviewed?
A - No.
Q-Do you know who Nancy Jackson is?
A-No.
Q-Do you know if Greg Primus was interviewed?

A-No.
Q - Do you know who Greg Primus is?
A - No.
Q Do you snow if Niasha was in a relationship with someone named Craig?
A It sounds familiar he may have been a past boyfriend.
Q- Do you know if he was interviewed?
A-  I did not interview him.
 Q Do you recall if or did you ever learn that he had been interviewed?
A-No (Balfe depo, **Exhibit T** at 84:24-86:10)

121.    Despite the lack of probable cause at this point in the investigation, police investigators made no effort to locate or question Essay (Balfe depo, **Exhibit T** at pg. 90; Waldron depo, **Exhibit U** at pg. 38; Milan depo, **Exhibit S** at pg 70,71) or the person who called in the lead (Balfe depo, 85:16-20). A reasonable fact finder could conclude that the failure to do so was caused by the unreasonable tunnel vision focused on Derrick Redd and may have contributed to the constitutional deprivation and that any reasonable investigator would have understood the need for further inquiry.

122.    The plaintiff argues that an analysis of the events reviewed above can in no way provide probable cause to arrest Derrick Redd; certainly not as a matter of law. The defendants argue, as they must, that probable cause must be judged by the totality of the knowledge in police possession and the totality of the circumstances present at the time of arrest.  As of the day the lead came in naming Essay as a boyfriend of the victim, the possible father of her baby and a suspect in the murder, the People acknowledge probable cause did not exist (Memo of Law, pg. 13). Yet, they did not even attempt to investigate the lead.

### Jinnette Gerve

123.    What follows is the piece of evidence that the people focus on most intently in their Memo of Law to argue that probable cause existed at the time of arrest. It is an ear-

witness account from the upstairs neighbor, Jinette Gerve. The legal significance of Ms. Gerve's statement is crystalized in the citation from *Candelario v. City of New York*, No. 12-CV-1206 (LAP), 2013 U.S. Dist. LEXIS 48412, at *15 (S.D.N.Y. Mar. 29, 2013)): "[a]n eyewitness's unequivocal identification of an individual as the perpetrator of the crime generally establishes probable cause, as long as it is reasonable to believe the eyewitness under the circumstances". Here, it was unreasonable to believe Jinnette Gerve without further inquiry.

124.    On November 2, 2008, at 8:30pm, police did investigate a Crimestoppers tip. However, it was not the tip received three days earlier that named Essay as the possible father of the child and a suspect. The lead came from a location that two police officers had already been to and from a woman, Jinette Gerve, that had been spoken to by P.O. Beam and lead Detective Balfe.

125.    Plaintiff argues here today that the circumstances surrounding the statement from Ms. Gerve are such that no reasonable officer could have relied on what the witness said to establish probable cause without further inquiry and that the People's reliance on this witness was so unreasonable as to contribute to the constitutional deprivation, or at least that a reasonable fact finder could conclude that the investigator's reliance was unreasonable.

126.    The tip was phoned in containing false information. A male caller stated that his Aunt had a six-year old son and lives directly upstairs. Detective Milan's DD5 documenting the interview opens with Ms. Gerve telling Milan that she had no nephew, but "I will tell you what I heard" (**Exhibit Q**, DD5-53). Milan was asked if he addressed the inconsistency. He responded: "she pretty much told me I don't have a nephew, so I didn't go any further into the caller, no,

sir" (Depo, 89:4-6) and later acknowledged that he never took any steps to investigate the discrepancy nor did he learn of anyone else doing so (Id at 90:2-13).

127.     Detective Waldron and Detective Milan were dispatched to follow up on the Crimestoppers lead. Neither one recalls who directed them to do so. Milan testified: "There was another Crime Stopper tip that came in, which the particulars are slipping me right now, but it led me to interviewing a lady who resided in that building (Milan depo, **Exhibit S** at 77:15-18). Waldron was asked if he recalled being directed to follow up on any Crimestoppers tip for the Delain murder investigation. He said: "No. I don't" (Depo, **Exhibit U** at 42:13-16).

128.     Detective Milan testified that he made quite a few attempts to reach Ms. Gerve. First, he spoke with her younger son. On another attempt, he spoke with an older son. On a third attempt, he spoke with a neighbor. Milan recalled that he "made quite a few attempts until finally I did reach her" (Milan depo, **Exhibit S** at 80: 4-25).

129.     At this point, Detective Milan had made several attempts to follow up on this lead but acknowledged he was not even aware of the "Essay" lead. Despite this, Milan testified that he had a working knowledge of the investigation at the time he finally reached the possible witness (Milan depo, **Exhibit S** at 82:5-9).

130.     Milan did not have working knowledge of the case at the time of the interview. He had plenty of time to get up to speed as he was making "quite a few" (Id) attempts to reach her. Detective Milan was attempting to interview a witness that had spoken to two different officers, including the lead detective, and who told them she saw and heard nothing. Detective Milan had no knowledge of this when he interviewed the potential witness.

131.    He was asked if he knew that Gerve had spoken to officers at the scene and told

them that she saw and heard nothing? He replied that he did not but acknowledged its

relevance to the investigation (depo, **Exhibit S** at 82:10-20). He was asked if he knew, at the

time he interviewed the witness, she had spoken to Detective Balfe days earlier and told him

she didn't see or hear anything. He replied that he did not (depo, **Exhibit S** at 84:17-21).

132.    Detective Milan was asked whether an officer having working knowledge of the

case was important factor in determining who should interview a witness or a suspect. He

replied: "Well, you don't want to send someone in blind into an interview not knowing anything

or having any idea what's occurring. You want them to have some knowledge, right, before

they start speaking to the witness, to see what the witness is stating or whatever it is that

they're claiming they saw or heard, if there's any validity to it. If you don't have any knowledge

as to anything regarding the case, you wouldn't really have the right questions to ask, if that

makes sense" (Milan depo, **Exhibit S** at 17:20 – 18:6).

133.    The response from Detective Milan makes perfect sense. Detective Milan never

asked Ms. Gerve about her previous statements to police directly contradicting her current

statements because he didn't know about them. He was asked if prior inconsistent statements

would have been relevant? He replied: "It would have been relevant to the point where

obviously I would have definitely addressed -- if I would have known, I would have addressed

the fact and brought it to hey, so I'm aware that you made or you were spoken to if you will

two different times, these are statements that you made, and I would have asked her why is it

that you stated that you didn't know anything then, let's say, and now you're stating this to me,

so if that answers your question, I would have addressed that, yes (depo, **Exhibit S** at 85:14-23)

134.    Detective Milan was asked if he was aware that Gerve had seen Derrick at the

scene and knew his name? He replied that he was unaware (depo, **Exhibit S** at 86:19-22) and

added: "The first time that I heard her say Derrick was at that moment, and I didn't do any

other follow up as I recall today. I didn't do any other follow up regarding the name. I took that

information, but I didn't do any other follow up. I took her at her word that she heard stop,

Derrick" (depo, **Exhibit S** at 88:2-7).

135.    He was asked why he didn't investigate further:

Q - when you are interviewing a witness, do you take their statements at face value or
are you trained to consider the truthfulness of their statements?
A ... the best way I can answer that, you take it and you try to corroborate it if you can
(Milan depo, **Exhibit S** at 20: 10-21)). He added "You would document the statement
that they make and you would follow up on the statement the best you could and you
would look for corroboration" (Milan depo, 20:21-21:4).
Q If they give you false information, does that affect their credibility?
A – I would say so, yes, especially if you're able to corroborate it (Milan depo, **Exhibit S**
at 22:16-19).

136.    Of course, this could all have been corroborated. But it wasn't. Milan testified

that "after I spoke to Ms. Gerve, I'm not privy to any other interviews of her or what type of

information was provided or questions were asked of her if that makes any sense" (depo,

**Exhibit S** at 90:20-24). He testified he took no further steps to determine the truthfulness of her

statements (depo, **Exhibit S** at 93:23-94:2).

137.    Detective Milan left the interview and went straight to the precinct:

Q Did you discuss this interview with Detective Balfe?
A Yes, I'm pretty sure I did, yes.
Q Do you recall anything about that conversation?
A I don't other than obviously giving – I think right after the interview we may have even
gone right to the 106 just to give him a common courtesy as to what occurred, but I
don't remember any particulars other than just notifying him on the fact (depo, **Exhibit
S** at 94:3-13).

138.     As to Detective Balfe, the lead detective was just told that Jinnette Gerve was

interviewed. He knew this witness was interviewed by P.O. Beam at the scene and told him that

she saw and heard nothing, that she thought the apartment was unoccupied. He knew that he

had interviewed her himself on October 30, and that she told Balfe himself that she saw and

heard nothing.

139.     Detective Balfe knew, because Det. Milan told him of the interview, that Ms.

Gerve had falsely claimed that she had not spoken to anyone about what she saw or heard

(**Exhibit Q**, DD5-53) and that she told Milan she had a third party call in a tip that contained

false information (that she had a nephew).

140.     Detective Balfe was informed by Detective Milan that the investigation, now a

week-long investigation, had finally been broken open by a woman he knew gave contradictory

information to three different police officers (Beam, Milan and Balfe himself). Balfe learned

that the witness told Milan that, at 5:30 in the morning, she heard someone scream "Stop

Derrick". Balfe was asked:

> Q - Did you come to interview her?
> A No, she was interviewed but I'm not sure by who.
> Q Okay. But you were the lead detective and somebody indicated that they didn't hear
> anything and then they changed their story and indicated "stop, Derrick, stop"; it's a
> stark contrast especially with . . ., another dishonest statement in there and you did not
> interview her yourself?
> A No (Balfe depo, **Exhibit T** at 100:13-23).

141.     Balfe was asked whether Ms. Gerve's acknowledgement of previous dishonesty

would be relevant to the investigation. He confirmed that it would be. However, when he was

asked if she ever did acknowledge her previous dishonest answers, he replied: I don't know

(Balfe depo, **Exhibit T** at 101: 5-16)

142.    Here, the content of the conversation was a bombshell revelation that formed

the basis of the probable cause used to arrest and prosecute the plaintiff despite the fact that

she had spoken to P. O. Beam and told him she saw and heard nothing and that she thought the

apartment was vacant; despite the fact that she spoke with Detective Balfe and basically said

the same thing, that she saw and heard nothing; that she falsely told police she hadn't told

anyone what she eventually told police and that she had gotten the police to her apartment by

having a friend call in a tip with false information would be relevant to the investigation.

Despite this, Milan was asked if, after the interview, he had probable cause for an arrest. He

testified: "Yeah, I did at that point, yes. Yes, I did" (Milan depo, **Exhibit S** at 94:16,17).

143.    Det. Waldron testified that "I would say that when we are interviewing a

witness, you know, we would pretty much take down what they said, you know, regardless. You

know, we wouldn't edit it in any way (Waldron depo, **Exhibit U** at 17: 18-25 - 18:2-5)

144.    As to this specific interview, Waldron had no memory at all:

Q Do you remember anything that was said by Detective Millan during that interview?
A No.
Q Do you remember anything that was said by Jinnette Gerve during that interview?
A No.
Q Do you recall anything you said or heard during the interview?
A – No (Depo, **Exhibit U** at 44:18-45:2)

145.    Detective Waldron was asked about his faulty memory:

Q-Detective Millan is interviewing someone, with you in the room, that heard someone
who said, Stop, Derrick -That is something you don't recall?
A I don't recall it, no.
Q Do you recall Ms. Gerve stating she heard "Stop, Derrick"?
A I don't. I told you I don't even remember that at all (depo, **Exhibit U** at 41:16-42:12).

146.    There can be no denying that this was a bombshell statement in a week-long

criminal investigation that, until that point, was going nowhere. Det. Waldron's complete lack

of memory about such an impactful moment could cause a reasonable fact finder to doubt the veracity of the entire interview and of Gerve's statement. Although the question before this Court is the reasonableness of the probable cause determination at the time of arrest, the jury failed to credit her version at trial.

147.    Detective Waldron's blanket denials of any recollection at all of a bombshell interview that blows open an investigation into a brutal murder and Detective Milan's denial of any knowledge of previous steps taken by police investigators and the failure to make any inquiry into the same could cause a reasonable fact finder to conclude that it is reasonable to infer that Milan and Waldron either induced Gerve to perjure herself or unreasonably relied on the incredible statement that contradicted all timelines and her own previous assertions.

148.    In this particular case, you have a witness that contradicts her own statements. She gave a statement to police canvassers at the crime scene stating that she heard nothing and thought the apartment was empty. She told the lead detective days later that she saw nothing and heard nothing. She caused a Crimestoppers tip to be called in with false information. Finally, a full week after the crime, she tells police that she heard someone say "Stop Derrick". This would drastically reduce the reliability of this witness and create an element of doubt. The inconsistent statements place all of her assertions in doubt such that probable cause could not be established by her assertions without further review. At this stage of the pleadings, that is not the standard. The standard is whether a reasonable fact finder could conclude that this witnesses' statements should not have been taken at face value without further inquiry.

**THE ARREST**

149.    Balfe testified he "conferred with the Queens District Attorney's Office (QCDA)
and they said that his arrest was warranted so I contacted the Queens Warrant Squad or
actually I think it was the Violent Felony Apprehension Squad" (Balfe depo, **Exhibit T** at 92:18-
24).

> Q - Okay. Can you tell me the sum and substance of the conversation between you and
> the Queens District Attorney that led to their believing there was sufficient cause?
> A Well they were up to date on all the evidence that was gathered and they felt that
> there was probable cause for his arrest" (Balfe depo, **Exhibit T** at 92:18-24).

150.    The Queens District Attorney was not "up to date on all the evidence that was
gathered" as Balfe stated, at the time of arrest. A reasonable fact finder could conclude that
when Detective Balfe and the QCDA "conferred", Balfe did not convey the full and complete set
of facts to the DA.

151.    A reasonable fact finder could conclude Detective Balfe told the QCDA that the
victim had one boyfriend and his name was Derrick; that he had a witness who heard someone
scream "stop Derrick" at 5:30 in the morning of Oct 25; that Derrick's phone records indicate he
was near the scene around that time; that the victim's mother thinks he did it; that police
photographed every single text message in the victim's phone, which revealed a tumultuous
relationship between the two; that the apartment smelled like bleach when police entered and
that Derrick had cleaning products in his vehicle; that the intruder likely had  a key; that he
"behaved suspiciously at the scene" (Memo of law, pg. 14-15) and that police had evidence
they could "reasonably interpret [Redd] had a guilty mind" (Memo of Law, pg. 15).

152.    A reasonable fact finder could conclude that the QCDA based their determination that probable cause to arrest Derrick Redd existed based on the facts above presented to them by Det. Balfe and that the facts presented were not complete or truthful, leading the QCDA to issue an arrest warrant based on false information.

153.    When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983. *United States ex rel Moore v. Koelzer*, 457 F.2d 892, 893-94 (3d Cir. 1972); *see also Smith v. Springer*, 859 F.2d 31, 34 (7th Cir. 1988); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988).
*Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. N.Y. August 21, 1997)

154.    A reasonable fact finder could conclude that the QCDA didn't know that Gerve had spoken to the lead detective days earlier and told him she saw and heard nothing; that Gerve told P.O. Beam she saw and heard nothing at the scene; that Gerve learned Derrick's name at the crime scene a week earlier or that Ms. Wimms told Gerve that Derrick killed Niasha at the scene, and; that Gerve 's timeline directly contradicted all information about the time of death in police possession at the time. A reasonable fact finder could conclude the QCDA didn't know these facts because the only person to interview Gerve, Det. Milan, didn't know any of these facts (depo, **Exhibit S** at 82.10-88:7) when he interviewed her on the same day Balfe "conferred" with the QCDA.

155.    A reasonable fact finder could conclude that the QCDA didn't know that Mr. Redd was at the scene at least six hours before the approximate time of death; that the victim,

although nine months pregnant, had multiple paramours; that a lead was called in directly implicating a former and/or current paramour that had not yet been investigated; that witnesses had provided an alibi for Mr. Redd at the estimated time of death; that the cuts on his hand were so superficial as to be irrelevant.

156.    A reasonable fact finder could conclude that the QCDA was not up to speed at the time they issued the arrest warrant because Det. Balfe was unaware of so many relevant and material facts at the time they "conferred" that he could not possibly give a complete review of the facts so as to get the QCDA "up to speed" in order to make a proper probable cause determination.

157.    As the People argue in their Memo of Law (pg. 13), "[a]n eyewitness's unequivocal identification of an individual as the perpetrator of the crime generally establishes probable cause, as long as it is reasonable to believe the eyewitness under the circumstances" *Candelario at 15).*

158.    The Gerve statement and interview were insufficient to support probable cause as no reasonable officer could rely on her statements without further inquiry. It was not reasonable to believe the [ear]witness under the circumstances. She had directly contradicted the statement relied on two previous occasions and the timeline of her statement did not match the time of death, by over six hours. Both the Donaldson report and the phone records supply evidence that the time of death was around 2pm on Saturday.

159.    But there is more. Days after the Gerve interview, the People received the official Autopsy Report. Dr. Marianne Hamel, who was employed as the City Medical Examiner at the office of the Chief Medical Examiner of New York City at the relevant time, conducted the

autopsy of the victim. Ms. Hamel testified that the autopsy took place at 11:30 am on October 26, 2008 (TT, **Exhibit G** at 1628:11-20). Police received the Draft Report on November 5, 2008 (**Exhibit JJ**).

160.    The expert's Report made critical points about the victim's time of death. She testified that she could predict the time of death within a twenty- four-hour period from the time she conducted the autopsy and that she conducted the autopsy at 11:30 am on October 26 (TT, **Exhibit G** at 1639:15-1640:8).

161.    That would mean that Niasha Delain was killed sometime after 11:30 on October 25, 2008. This directly contradicts Jinnette Gerve's statement that, at 5:30 am, she "heard somebody screaming What you doing to me, Derrick. No. Stop. Derrick. No. And I heard one time slightly boom. No Derrick. No. No. Don't do that to me. Stop. Stop. No, Derrick, and until the person stopped" (TT, **Exhibit F** at 1456:14-18).

162.    The Report that the People received from the Medical Examiner's office confirmed what was already known from the beginning of the investigation from the Donaldson Report and the initiation of a data session from the phone; that the time of death occurred sometime after 11:30 am on the 25th.

163.    Ms. Hamel finished with a definitive statement about her conclusions from the Report that was in police possession prior to the initiation of the prosecution. She stated: "I found nothing in my autopsy that would be consistent with the time of death of 6am the previous day" (TT, **Exhibit G** at 1643:13,14). Ms. Gerve's statement was proven false and could not be relied on in a probable cause determination. Balfe, Milan and Waldron should have

behaved as reasonable investigators and inquired further before taking Gerve's statement at face value and reporting unreliable evidence to the QCDA and initiating the prosecution.

164.    When the People received the Draft Report from the Chief Medical Examiner Dr. Marianne Hamel, on November 5, 2008, the police investigators either had the time of death from the Donaldson Report confirmed or just became aware that the statement from Gerve, that she heard a scream at 5:30 am, was directly contradicted by the forensic evidence (**Exhibit JJ**, Draft Autopsy Report).

165.    He could have or should have conducted a follow up interview or taken some steps to conduct a further inquiry. Balfe was asked: But you were the lead detective and somebody indicated that they didn't hear anything and then they changed their story and indicated "stop, Derrick, stop" it's a stark contrast especially with . . . another dishonest statement in there and you did not interview her yourself? A - No. (Balfe depo, **Exhibit T** at pg. 100 16-23).

166.    He did nothing. He did not interview the only witness to place the plaintiff at the scene, even after the Medical Examiner provided an estimated time of death that differed from her version by over six hours. He, Det Milan and some other people simply "conferred" with the District Attorney, brought them "up to date" and "it was agreed upon that Derrick, Mr. Redd, was going to be arrested" (Balfe depo, **Exhibit T** at 92:20-93:5).

167.    At this stage of the pleadings, the question is whether a reasonable fact finder could hold that the police did not provide truthful or complete information to the QCDA in order for them to make a proper probable cause determination. Jinette Gerve's statement should not have been taken at face value without further inquiry by a reasonable officer.

168.   The People conclude their argument that probable cause to arrest Mr. Redd existed at the time of arrest by citing case law that held "Those who do not take into account conditional probability are prone to making mistakes in judging evidence. They may think that if a particular fact does not itself prove the ultimate proposition (e.g., whether the (officer had probable cause), the fact may be tossed aside and the next fact may be evaluated as if the first did not exist" *Stansbury v. Wertman*, 721 F.3d 84, 2013, quoting *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) at 92-93. The significance of each (relevant) factor may be enhanced or diminished by surrounding circumstances" Id. at 93).

169.   Plaintiff could not agree more. In that case, the Court held "[r]eview for probable cause should encompass "plainly exculpatory evidence" alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta*, 460 F.3d at 395). *Stansbury v. Wertman*, 721 F.3d 84.

170.   Here, a reasonable fact finder could conclude that the failure to present the fact that Ms. Gerve's statement directly contradicted the approximate time of death by over six hours, in addition to the other items not presented, *supra*, led to the QCDA making a probable cause determination based on faulty information provided by police investigators and exculpatory evidence withheld.

## POST – ARREST AND THE GRAND JURY PRESENTMENT

171.   The People argue that "in the time between plaintiff's arrest and subsequent prosecution, probable cause was actually strengthened" (Memo of Law, pg. 17). This is not true.

The People point to the post-arrest discovery that the plaintiff called a friend from the scene to go to his apartment to get rid of an illegal weapon[7] (Memo of Law, pg. 17).

172.     The argument must fail. Mr. Redd was at his mother's apartment for many hours after the murder. He could have gotten rid of any weapon he needed to during that time. Here, he was called to the crime scene by the victim's mother. He knew he was going to Niasha's apartment. The phone call to his friend could be interpreted by a reasonable fact finder to show that he was shocked by the discovery of the body, knew as potential father to the child he would be a suspect and made the panicked call. It can in no way be described as contributing to the probable cause determination post-arrest.

173.     The plaintiff has presented evidence that the QCDA was not given the complete collection of evidence in their possession at the time to ensure the QCDA, and the Court, has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. The presentment to the Grand Jury illustrates the lack of probable cause when the People present false evidence and concealed relevant and material exculpatory evidence.

## GRAND JURY

174.     The Grand Jury was given false information. The false information was relevant and material and of such a nature as to call into question the validity of the indictment.

175.     The Constitution mandates that no person shall be held to answer for an infamous crime unless upon indictment of the Grand Jury (NY Const, art I, § 6). The section is similar in form and purpose to that contained in the Fifth Amendment to the United States Constitution. The

---

[7] The weapon was not a knife, which was used to commit the murder.

idea underlying both these provisions was to preserve on the English model a fair method for instituting criminal proceedings against persons believed to have committed crimes. The Grand Jury was created as an investigative and accusatory body made up of laymen from the general population and given the function of assessing the sufficiency of the prosecutor's case, thus insulating the innocent from governmental excesses. Unhampered by technical legal rules of procedure and evidence and divorced from the control of the government, the grand jurors were free to make their presentments and indictments as they deemed satisfactory, "pledged to indict no one because of prejudice and to free no one because of special favor" (*Costello v United States*, 350 U.S. 359, 362; and see *People v Glen*, 173 NY 395, 401; *United States v Umans*, 368 F2d 725, 730). The Grand Jury's role and procedures are now defined by statute (CPL art 190). It remains the exclusive judge of the facts with respect to any matter before it (CPL 190.25, subd 5) and it may indict for an offense only if the evidence spells out a legally sufficient case and reasonable grounds to believe defendant committed the offense charged ( CPL 190.65, subd 1). "Legally sufficient evidence" means competent evidence which, if accepted as true, would establish every element of the offense and the defendant's commission of it (CPL 70.10, subd 1; *People v Haney*, 30 NY2d 328, 335-336). The test is whether the evidence before the Grand Jury if unexplained and uncontradicted would warrant conviction by a trial jury (*People v Valles*, 62 NY2d 36; *People v Dunleavy*, 41 AD2d 717, affd 33 NY2d 573). It is this judgment of the Grand Jury, expressed in an indictment, which provides the predicate for the court's jurisdiction (CPL 100.05; *Matter of Simonson v Cahn*, 27 NY2d 1).

176.     The other subject for consideration is the prosecutor's responsibility under the circumstances presented. It is familiar doctrine that a prosecutor serves a dual role as advocate

and public officer. He is charged with the duty not only to seek convictions but also to see that justice is done. In his position as a public officer he owes a duty of fair dealing to the accused and candor to the courts, a duty which he violates when he obtains a conviction based upon evidence he knows to be false. Such misconduct may impair a defendant's due process rights and require a reversal of the conviction (see, e.g., *People v Robertson*, 12 NY2d 355; *People v Savvides*, 1 NY2d 554; *People v Creasy*, 236 NY 205, 221; *Napue v Illinois*, 360 U.S. 264; *Alcorta v Texas*, 355 U.S. 28). It goes without saying that this duty also rests upon the prosecutor during pretrial proceedings (see, e.g., *People v Geaslen*, 54 NY2d 510; *People v Cwikla*, 46 NY2d 434) and the proceedings relating to indictment both at presentment and afterwards. "It is a serious matter for any individual to be charged with crime whether the charge be true or false" and it is as important "'that he be fairly and justly accused . . . as that he be fairly and impartially tried'" (*People v Minet*, 296 NY 315, 322-323, quoting *Matter of Gardiner*, 31 Misc 364, 375). Thus, we have held a defendant has a procedural right to challenge an indictment founded upon inadequate or improper evidence which is of constitutional dimension (*Matter of Jaffe v Scheinman*, 47 NY2d 188, 194; *People v Sexton*, 187 NY 495, 511-512).

177.    Indictments are presumed to be valid (*People v Bergerson*, 17 NY2d 398, 402; *People v Howell*, 3 NY2d 672, 675; *People v Sexton, supra*), and they are rarely open to attack on grounds of inadequacy after a conviction because such attacks lend themselves to abuses (see *Costello v United States, supra*; *Holt v United States*, 218 U.S. 245; and see CPL 210.30). However, courts have exercised their inherent powers to dismiss an indictment, even then, when there was a total lack of evidence before the Grand Jury (see *People v Glen*, 173 NY 395, 400, *supra*), when the quality of the evidence is challenged because the witness's testimony was

perjured ( *United States v Basurto*, 497 F2d 781; cf. *United States v Flaherty*, 668 F2d 566; *United States v Kennedy*, 564 F2d 1329, cert den *sub nom. Myers v United States*, 435 U.S. 944), or when the indictment is founded on hearsay testimony which the Grand Jury may not have understood as such ( *United States v Estepa*, 471 F2d 1132). Courts have dismissed in these circumstances even though there was sufficient other reliable evidence presented, or the prosecutor acquired the knowledge of the false evidence after the indictment was handed up, or the prosecutor made a full disclosure of the falsity after discovering it (*United States v Basurto, supra*; cf. *People v Leary*, 305 NY 793). Indeed, courts have stated that indictments may be dismissed solely because they were obtained by the prosecutor for improper motives (see, e.g., *United States v DeMarco* , 401 F Supp 505, affd 550 F2d 1224; *People v Tyler*, 46 NY2d 251; *Matter of Cunningham v Nadjari*, 39 NY2d 314, 318). *People v. Pelchat*, 62 N.Y.2d 97, 104-106 (N.Y. May 15, 1984).

178.     Here, the victim's mother, Tawanda Wimms, gave false testimony to the Grand Jury. She was asked:

> Q- Ms. Wimms, do you know a person by the name of Derrick Redd?
> A-Yes.
> Q-How do you know this person?
> A-He was Niasha's baby father and boyfriend.
> Q How long have you known him
> A-About a year. (GJT, **Exhibit EE** at 13,14)

179.     The false testimony was presented to the Grand Jury within minutes of the beginning of her testimony, immediately after background questions into address and family. It was clearly prejudicial to the plaintiff. Members of the Grand Jury are hearing from the victim's mother. A reasonable fact finder would naturally consider that the mother of a woman on her due date would have keen observations into the type of person her daughter was having a baby with. Her impression on the Grand Jurors cannot be overstated.

180.    Towanda Wimms is the mother and grandmother of the victims. She discovered the body and was at the scene when police arrived. The image of that woman's anguish and despair at that moment is unthinkable. It is perfectly understandable that the Grand Jury receiving information from her would be emotional. It is unavoidably human.

181.    Ms. Wimms made her opinion about what happened to her daughter and grand-daughter very clear to the Grand Jury. Both the Grand Jurors and the police, at first glance, could reasonably conclude that Ms. Wimms had insight into what type of relationship her daughter had with Mr. Redd; that she knew what kind of person Mr. Redd is, what he liked and disliked, where he worked and how he treated her daughter. That kind of insight can be invaluable to a juror and it can be reasonably assumed that a Grand Jury would conclude, after hearing the false testimony, that Ms. Wimms knew the plaintiff and that any statement from Ms. Wimms came from a position of someone with close familial knowledge and intimacy.

182.    The notion of close, intimate knowledge is reinforced immediately following, when Ms. Wimms recites his phone number to the members of his Grand Jury. During the investigation, she told police that she had to look up his number on the day of the murder. Here, she recites it from memory as you would with someone you knew closely, like a family member. Whether the impression of a close intimate relationship between the two was purposely presented cannot be known, but its impression on the Grand Jury is undeniable.

183.    The impression of familiarity was pursued once again when Ms. Wimms told the Grand Jury that the two strangers had a conversation about Derrick's relationship with his father and that Ms. Wimms told Derrick that his father would be disappointed in him if he "knew the things he did to Niasha". The testimony was misleading and prejudicial.

184.    Ms. Wimms then provides her opinion as to whether the plaintiff showed any emotion or expression in the moment the body was discovered. The complete stranger told the Grand Jury he looked "regular" (GJT, **Exhibit EE** at JC13:11-13).

185.    Despite her impassioned opinions, Ms. Wimms cannot have provided any probable cause to arrest Mr. Redd as she had never met him prior to the day of the murder. Never. Tawanda Wimms had never met the father of her grand-son up until the day he was murdered. The Grand Jury was, deliberately or not, given the false impression of familial knowledge.

186.    The police investigators knew that Ms. Wimms and the suspect were complete strangers prior to the arrest. The District Attorney also knew prior to the Grand Jury presentation.

187.    Here, we have a sympathetic woman, her daughter murdered on her due date, telling a Grand Jury that she has known Mr. Redd for a year (GJ, **Exhibit EE** at JC 3:25-4:6), that she recalled his phone number (Id at JC7-8:1), that the two spoke conversationally in the car about his relationship with his father and the advice he gave to him (Id at JC11:2-5).

188.    She is then permitted to tell the Grand Jury that "if [Derrick's] father knew the things he did to Niasha he would be disappointed in him" (Id, JC11:8,9) and that when she went outside, there was a man: "[a]nd I told him, my daughter is dead in the bedroom and I asked if he could go in and keep an eye on Derrick" (Id, JC14:18-20) and to give her impression of the propriety of his actions at the scene (JC14:6-15; JC16:1-12).

189.    The Grand Jury was misled. A reasonable fact finder could conclude that the information given to the Grand Jury was false and the false information improperly led to the

indictment; that if the Grand Jury knew that Ms. Wimms was a complete stranger, her impressions of the plaintiff on the day of the discovery of the body and her opinions about his actions and demeanors would not be given the same weight that a traditional mother-in law's opinion would be given and that the difference was relevant and material.

190.   That is not all. Ms. Gerve testified before the Grand Jury. Although the plaintiff is not in possession of the testimony, it is reasonable to conclude that she testified consistently with her statements on the police DD5, and her testimony in both trials. That is, she heard someone scream "Stop Derrick" at 5:30 am on October 25, 2008.

191.   Dr. Marianne Hamel testified before the Grand Jury. She testified to the eight stab wounds to her torso, and three to her head and neck (**Exhibit HH,** JK 70). She testified about the wounds to the fetus and that the male was full term and that the cause of death for both was from the stab wounds (**Exhibit HH,** JK69-JK72).

192.   What she never testified to as she was never asked was – Can you estimate the time of death? Dr. Hamel testified at trial. She testified "I found nothing in my autopsy that would be consistent with the time of death of 6am the previous day" (TT, **Exhibit G** at 1643:13,14).

193.   Before the Grand Jury, she was not even asked the question. With no physical evidence and the only witness to place the Plaintiff at the scene said she heard him at 5:30am, the Medical Examiner was not asked if that time of death was consistent with her findings. Of course, she was not asked this question because her findings directly contradicted Ms. Gerve, the People's only witness. The People withheld this information from the Grand Jury. The fact was relevant and material.

194.     Here, a grand jury indicted Plaintiff, raising a presumption of probable cause. But, plaintiff's allegations rebut that presumption. The indictment was allegedly based on: Towanda Wimms testimony regarding her interactions with the plaintiff on the day of the murder and the evening that the body was discovered and the testimony of Jinnette Gerve, who testified that she heard someone scream "Stop, Derrick" at 5:30 am on October 25th.

195.     Towanda Wimms did not know the plaintiff before the day of the murder and testified to the Grand Jury that she knew him for about a year and is then permitted to tell the Grand Jury that "if [Derrick's] father knew the things he did to Niasha he would be disappointed in him" (Id, JC11:8,9) and that when she went outside, there was a man: "[a]nd I told him, my daughter is dead in the bedroom and I asked if he could go in and keep an eye on Derrick" (Id, JC14:18-20) and to give her impression of the propriety of his actions at the scene (JC14:6-15; JC16:1-12).

196.     Dr. Hamel estimated the time of death to be within twenty-four hours of the time she conducted the autopsy, which confirmed the initial findings in the Donaldson Report where the body was examined at the scene. This directly contradicted the testimony of the only witness in the case, Jinnette Gerve's. This fact was relevant and material. Its omission misled the Grand Jury. The difference in the time when the witness said she heard the screams and when the M.E. determined the time of death is stark. They cannot both be true. A reasonable fact finder could conclude that, absent the inclusion of the Towanda Wimms' testimony and the exclusion of the Medical Examiner's estimated time of death, the Grand Jury could have held that no probable cause existed. Summary Judgment is not appropriate.

197.    Accordingly, taking the allegations as true and granting all reasonable inferences in Plaintiff's favor, as the Court must, Plaintiff has adequately alleged that the indictment was a product of "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello*, 612 F.3d at 162 (internal quotation marks omitted). Plaintiff has rebutted the presumption of probable cause caused by the indictment of Mr. Redd.

198.    By Decision and Order, dated July 6, 2016, the Supreme Court of the State of New York Appellate Division for the Second Judicial Department reversed the conviction and ordered a new trial. The decision overturning the conviction identifies many of the issues presented here today. The similarities are striking:

199.    The prosecutor brought up, during opening statement, irrelevant and prejudicial evidence that the defendant had dated the victim's aunt from 2000 to 2003, but the relationship "did not end happily," and although the victim's parents had never met the defendant, they certainly knew who he was and "wouldn't be fond to hear that [their daughter] was now involved with [the defendant]." The prosecutor then gratuitously insinuated that the defendant was a person of bad character by stating, "This was a problem. Her family didn't want [the victim] to date him because‐‐I'm not going to get into that."

200.    Still during opening statement, the prosecutor stated that "three little cuts" found on the defendant's right hand occurred during the stabbing, theorizing that "if you're holding a knife ... and you use it repeatedly to stab somebody, one, that can get slippery a little bit with blood and two, if the point of that knife hits something inside the body like a bone or a baby's head or anything like that, the blade may stop for a moment, but the object in motion, your hand, continues to move unless there is [a] cross guard." Although defense counsel

objected to this remark, the trial court did not rule on the objection. The prosecutor then
repeated essentially the same statement – again over defense counsel's objection--and the
court's only response was to say "[t]his is summation."

201.    Significantly, none of the prosecution witnesses later testified that the nature
and location of the small cuts on the defendant's hand were consistent with an injury sustained
while holding a knife ( *People v Silvestre*, 118 AD3d 567, 567). During summation, the
prosecutor flatly misstated the medical examiner's testimony regarding the estimated time of
death, quoting her as saying ‥J found nothing in my autopsy that would be inconsistent with
the time of death of six A.M." and asking, rhetorically, "Can we get more clear than this ladies
and gentlemen?" In fact, the medical examiner's testimony was, "I found nothing in my autopsy
that would be consistent with the time of death of six a.rn. the previous day." While defense
counsel objected to the prosecutor's misstatement, the trial court's only response was to say
"[t]hat is the jury's determination." Echoing the earlier remark from his opening statement, the
prosecutor again sought to explain, on summation, the small cuts on the defendant's hands by
saying that "during this repeated stabbing, you may get yourself a little cut there a little cut
there and a little cut there," particularly "'[i]f the blade stabs something hard, like a baby." Not
only was the remark needlessly inflammatory, it also improperly cast the prosecutor as an
unsworn expert witness in his own case. Defense counsel objected, and the trial court asked
the prosecutor not to testify.

202.    Also during summation, the prosecutor improperly vouched for Gerve's
credibility, describing her as a "sharp-cared woman," and speculating that her sense of hearing
was particularly well developed from "listening to her asthmatic son breath from a distance

since four months old." Defense counsel objected, but the trial court did not rule on the objection. The prosecutor was also allowed, during summation, to read stricken hearsay testimony from Gerve about a conversation she repeatedly had with a friend about calling Crime Stoppers. Defense counsel, who did not have a transcript of Gerve's testimony during the prosecutor's summation, brought the matter to the trial court's attention at the earliest opportunity the following day, while the jury was still deliberating. Further, in commenting on the defendant's comportment after the discovery of the victim's body, the prosecutor tried to inflame the jury by characterizing the defendant as "cold-blooded" enough to "have stabbed a woman as many times as he did." In sustaining defense counsel's objection, the trial court warned the prosecutor not to inflame the jury.

203.    Undaunted, however, the prosecutor continued, calling the defendant "a very angry person" given the amount of force used, the "tremendous amount of overkill". Upon defense counsel's further objection, the court directed the jurors not to speculate. The prosecutor continued, stating that the defendant ·'didn't trust [the victim] with his heart" so ·'[h]e stabbed her in hers," and also 'in the lungs," and "in the face," and "in the hands," and 'in the belly, the nine month pregnant belly" because he ·wanted to make sure this baby went because the baby is the whole thing:· Defense counsel objected, and the court admonished the prosecutor once again that ·'f i] r you keep inflaming the jury, you are going to regret it."

204.    Nevertheless, the prosecutor again returned lo this theme toward the end or his summation, remarking that "any human being would be surprised. But not the person who did it· Defense counsel objected again, but this lime the trial court said only that it was "his comment, his interpretation of the evidence: Soon thereafter, the prosecutor continued his

string of inflammatory remarks by stating, "It happens, when you can't get somebody to [get] an abortion ... you have to take care of them the last day yourself." The prosecutor also noted that if the dead child had been born. "he would be three years old."

205.    The trial appeared to be a continuation of the investigation. However, conduct at the trial is irrelevant to the allegations at issue in the People's motion. A Court's "assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone". *Husbands ex rel. Forde v. City of N.Y.,* 335 F. App'x 124, 127 (2d Cir. 2009) (citing *Martinez v. Simonetti, 202* F.3d 625, 634 (2d Cir. 2000)) (Memo, pg. 11) and that "As the Second Circuit has stated, "(a) story is never a single chapter, it is the experience of the entire tale; the same is true of probable cause." See Stansbury, 721 F.3d at 93" (Memo, pg. 16)

206.    Here, a reasonable fact finder could conclude that the QCDA was given inaccurate and incomplete information at the time they issued the arrest warrant because Det. Balfe was unaware of so many relevant and material facts at the time they "conferred" that he could not possibly give a complete review of the facts so as to get the QCDA "up to speed" in order to make a proper probable cause determination.

207.    The Gerve statement and interview were insufficient to support probable cause as no reasonable officer could rely on her statements without further inquiry. It was not reasonable to believe the [ear]witness under the circumstances. She had directly contradicted the statement relied on two previous occasions and the timeline of her statement did not match the time of death, by over six hours. Both the Donaldson report and the phone records supply evidence that the time of death was around 2pm on Saturday. Those Reports were

confirmed by the Draft Autopsy Report received by police prior to the initiation of the prosecution.

208.    Questions of fact remain as to whether probable cause existed at the time of arrest.

## MALICIOUS PROSECUTION

### a) Initiation of the Prosecution

209.    Det. Balfe initiated the prosecution. To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. New York City Transit Authority*, 215 F.3d at 217

210.    Balfe testified he "conferred with the Queens District Attorney's Office (QCDA) and they said that his arrest was warranted so I contacted the Queens Warrant Squad or actually I think it was the Violent Felony Apprehension Squad" (Balfe depo, **Exhibit T,** 92:18-24).

> Q- Did you bring them up to date?
> A I did and along with Detective Millan and some other people and it was agreed upon that Derrick, Mr. Redd, was going to be arrested (Balfe depo, **Exhibit T,** 93:2-5).

211.    The Queens District Attorney was not "up to date on all the evidence that was gathered" as Balfe stated, at the time of arrest. A reasonable fact finder could conclude that when Detective Balfe and the QCDA "conferred", Balfe did not convey the full and complete set of facts to the DA.

212.    A reasonable fact finder could conclude Detective Balfe told the QCDA that the victim had one boyfriend and his name was Derrick; that he had a witness who heard someone scream "stop Derrick" at 5:30 in the morning of Oct 25; that Derrick's phone records indicate he

71

was near the scene around that time; that the victim's mother thinks he did it; that police photographed every single text message in the victim's phone, which revealed a tumultuous relationship between the two; that the apartment smelled like bleach when police entered and that Derrick had cleaning products in his vehicle; that the intruder likely had a key; that he "behaved suspiciously at the scene" (Memo of law, pg. 14-15) and that police had evidence they could "reasonably interpret [Redd] had a guilty mind" (Memo of Law, pg. 15).

213.   Detective Balfe contributed to the initiated the prosecution.

### b) Termination in the Plaintiff's Favor

214.   The case was terminated in the defendant's favor when the judgment of conviction was reversed on July 6, 2016 (Supreme Court Decision and Order, annexed to Francolla's Decl. as Exhibit "S.").

### c) Probable Cause

215.   See False Arrest, Probable Cause, supra.

### d) Malice

216.   A lack of probable cause generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d at 78; *see, e.g., Ricciuti*, 124 F.3d at 131; *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996). Further, malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996); *see also Lowth v. Town of Cheektowaga*, 82 F.3d at 573 (malice may be proven by showing that the prosecutor

had "a wrong or improper motive, something other than a desire to see the ends of justice served" (internal quotation marks omitted)).

217.     There is certainly sufficient evidence of this element to survive summary judgment. Under New York law, malice does not have to be actual spite or hatred, but means only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975, 976 (1978). In most cases, the lack of probable cause -- while not dispositive -- "tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330, 332 (4th Dep't 1980).

218.     Malice on the part of Balfe, Milan and Waldron could easily be inferred in light of the evidence in the present case of, *inter alia*, their apparently myopic focus on Redd, to the exclusion of all other suspects; willingness to accept as material and relevant statements from the victim's mother, who was a complete stranger to the plaintiff; willingness to coerce an inculpatory statement from Jinnette Gerve in exchange for extraordinary benefits; and their failure to report to the District Attorney the extraordinary differences between the lone witness' timeline and the Medical Examiner's time of death estimate, and; willingness to have Redd indicted on the basis of testimony of another person who was known to have previously lied to Balfe himself and to Officer Beam.

219.     Questions of fact remain as to the Malicious Prosecution claim. Summary Judgment is not appropriate.

## QUALIFIED IMMUNITY

220.    Defendants argue that they are entitled to qualified immunity from the false arrest, malicious prosecution, and fair trial claims on the ground that they had at least arguable probable cause to arrest Redd. (Defs. Mem. at 20,21).) They are incorrect.

221.    A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, *see, e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.E.2d 1043 (1998); *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.E.2d 277 (1991); or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, *see, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 817-19, 102 S.Ct. 2727, 73 L.E.2d 396 (1982); or (3) if the defendant's action was "objective[ly] legal[ly] reasonable [ ] . . . in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), 107 S.Ct. 3034, 97 L.E.2d 523 *Manganiello v. City of New York*, 612 F.3d 149, 164

222.    Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent. See, e.g., *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986))). With respect to both the legal question and

the matter of competence, the officials' actions must be evaluated for objective

reasonableness. *Manganiello v. City of New York*, 612 F.3d 149, 165

223.    Here, actions taken by police was unreasonable and prohibited, including being

laser focused on the plaintiff to such a degree as to be unreasonable; The information the police

received from Ms. Wimms was not reliable; While both Balfe and Milan admitted the presence

of another male in the apartment would be relevant to the investigation (Balfe depo, **Exhibit T,**

37:17-38:3)(Milan depo, **Exhibit S,** 67:2-5), they made no effort to investigate. Det. Balfe was in

possession of a Sim card that contained data from Redd's phone. He made no effort to investigate

(Balfe Aff, **Exhibit FF**); Balfe chose not to confirm with the cleaning lady that the crime scene was

professionally cleaned; The two men who the police investigators identified as previous

paramours of the victim (David Johnson and Essay), were not investigated; The defendants did

not produce a DD5, or any documentation at all, of the Pollard interview. But the interview did

take place. Ms. Pollard's Affidavit, which is attached as **Exhibit KK** states that she was at the

precinct and answered questions from Det. Milan about her and Derrick's whereabouts on

Saturday afternoon, October 25, 2008. A reasonable factfinder could conclude that the police did

not document the interview as it would provide definitive proof that the plaintiff was nowhere

near the scene at the estimated time of death and that the proof of his whereabouts was

deliberately and maliciously withheld from the plaintiff. Balfe withheld information from the

QCDA, including the fact that the only witness had lied to police on multiple occasions, that Redd

was nowhere near the crime scene at the estimated time of death, and; that the only witness'

timeline and account was directly contradicted by multiple pieces of evidence.

224.    The investigators were both plainly incompetent and in violation of police policy and the law. There is no qualified immunity.

**FAIR TRIAL**

225.    To prevail on a claim for denial of the right to a fair trial, a plaintiff must show that"(1) [an] investigating official (2) fabricated evidence (3) that was likely to influence a jury's decision, (4) forwarded that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012); see also *Keller v. Sobolewski,* 10-CV-5198 (FB) (RML), 2012 U.S. Dist. LEXIS 147395,(E.D.N.Y. Oct. 12, 2012) ("The harm suffered by an individual bringing a deprivation of the right to a fair trial claim is the 'deprivation of liberty' that occurs 'because of the fabrication.'") (quoting *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000)).

226.    Here, a reasonable fact finder could conclude that Jinnette Gerve's incredible statement was fabricated by Milan and Waldron.

227.    Milan was asked if he knew that Gerve, prior to his interview, had spoken to officers at the scene and told them that she saw and heard nothing? He replied that he did not but acknowledged its relevance to the investigation (depo, **Exhibit S** at 82:10-20). He was asked if he knew, at the time he interviewed the witness, she had spoken to Detective Balfe days earlier and told him she didn't see or hear anything. He replied that he did not (depo, **Exhibit S** at 84:17-21).

228.    Detective Milan was asked if he was aware that Gerve had seen Derrick at the scene and knew his name? He replied that he was unaware (depo, **Exhibit S** at 86:19-22) and

76

added: "The first time that I heard her say Derrick was at that moment, and I didn't do any other follow up as I recall today. I didn't do any other follow up regarding the name. I took that information, but I didn't do any other follow up. I took her at her word that she heard stop, Derrick" (depo, **Exhibit S** at 88:2-7).

229.   He was asked why he didn't investigate further:

Q - when you are interviewing a witness, do you take their statements at face value or are you trained to consider the truthfulness of their statements?
A ... the best way I can answer that, you take it and you try to corroborate it if you can (Milan depo, **Exhibit S** at 20: 10-21). He added "You would document the statement that they make and you would follow up on the statement the best you could and you would look for corroboration" (Milan depo, **Exhibit S** at 20:21-21:4).
Q If they give you false information, does that affect their credibility?
A -- I would say so, yes, especially if you're able to corroborate it (Milan depo, **Exhibit S** at 22:16-19).

230.   Of course, this could all have been corroborated. But it wasn't. Milan testified that "after I spoke to Ms. Gerve, I'm not privy to any other interviews of her or what type of information was provided or questions were asked of her if that makes any sense" (depo, **Exhibit S** at 90:20-24). He testified he took no further steps to determine the truthfulness of her statements (depo, **Exhibit S** at 93:23-94:2).

231.   Detective Waldron's blanket denials of any recollection at all of a bombshell interview that blows open an investigation into a brutal murder and Detective Milan's denial of any knowledge of previous steps taken by police investigators and the failure to make any inquiry into the same could cause a reasonable fact finder to conclude that it is reasonable to infer that Milan and Waldron induced Gerve to perjure herself.

232.   As to Detective Balfe, the lead detective was told that Jinnette Gerve was interviewed. He knew this witness was interviewed by P.O. Beam at the scene and told him that

she saw and heard nothing, that she thought the apartment was unoccupied. He knew that he had interviewed her himself on October 30, and that she told Balfe himself that she saw and heard nothing.

233.   Detective Balfe knew, because Det. Milan told him of the interview, that Ms. Gerve had falsely claimed that she had not spoken to anyone about what she saw or heard (**Exhibit Q**, DD5-53) and that she told Milan she had a third party call in a tip that contained false information (that she had a nephew).

234.   Detective Balfe was informed by Detective Milan that the investigation, now a week-long investigation, had finally been broken open by a woman he knew gave false information to three different police officers (Beam, Milan and Balfe himself). Balfe learned that the witness told Milan that, at 5:30 in the morning, she heard someone scream "Stop Derrick". Balfe was asked:

> Q - Did you come to interview her?
> A No, she was interviewed but I'm not sure by who.
> Q Okay. But you were the lead detective and somebody indicated that they didn't hear anything and then they changed their story and indicated "stop, Derrick, stop"; it's a stark contrast especially with . . ., another dishonest statement in there and you did not interview her yourself?
> A No (Balfe depo, **Exhibit T** at 100:13-23).

235.   The witness' statement directly contradicts the estimated time of death. The witness left for work shortly after 5:30 am, so the time she said she heard it could not be altered. A reasonable fact finder could conclude that the officers fabricated the statement and that Det Balfe accepted as true the false statement and "conferred" with the District Attorney and forward the information that would obviously influence a jury's decision, which resulted in Mr. Redd being incarcerated.

236.    A reasonable fact finder could conclude that the investigating officers failed to produce exculpatory evidence from Ms. Pollard, who told police she was with the plaintiff at the estimated time of death; failed to investigate Essay, who was a known paramour of the victim and the subject of a call-in tip identifying him as possibly the father of the child and the killer, relied on information from a total stranger, withheld relevant material information from the Grand Jury.

237.    Therefore, a reasonable fact finder could conclude, Gerve was offered an exorbitant package of benefits in exchange for the fabricated statement. Ms. Gerve was relocated from her apartment, she was given assistance with her job search, including helping her prepare her resume, a letter was sent on her behalf to her lawyer regarding her immigration status to the Violence Against Woman Act (VAWA) of the United states Customs and Immigration Service, which certified her as a cooperating witness (Stipulation, **Exhibit II**).

238.    Questions of fact remain as to whether the statement from Gerve was fabricated. Summary Judgment should be denied.

For the foregoing reasons, plaintiff respectfully requests that the Court deny the defendant's motion, together with such other further relief as the Court deems just and proper.

Dated: West Islip, New York
        August 4, 2022

Robert Kerrigan, Esq.

Cc:    Brian Francolla (By Email and ECF)
       Corporation counsel
       100 Church Street
       New York, New York 10007