UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
DERRICK REDD

                 Plaintiff,

      - against -                      **MEMORANDUM AND ORDER**
                                                   19-cv-2917 (RJD) (TAM)
THE CITY OF NEW YORK, et al.,

                 Defendants.
-------------------------------------------------------- x
DEARIE, District Judge

       Plaintiff Derrick Redd was found guilty of murdering his pregnant girlfriend in 2008. After reversal by the Appellate Division, a jury acquitted him of the same crime ten years later, in 2018. In this civil action, Redd seeks monetary damages from Defendants pursuant to state law and 42 U.S.C. § 1983 and § 1988, alleging "pervasive misconduct" in the course of his arrest, indictment, and prosecution. Pending before the Court is Defendants' motion for summary judgement.[1] For the reasons that follow, Defendants' motion is granted in its entirety.

## BACKGROUND

       Niasha Delain was found dead at her Queens, New York apartment on the evening of October 25, 2008. An autopsy revealed that Delain had been stabbed 26 times. Delain was nine months pregnant at the time; October 25 was her due date. The fetus did not survive. Plaintiff Redd was Delain's on-again, off-again boyfriend and the father of her unborn child. Redd and Delain's mother, Towanda Wimms, discovered Delain's body on the evening of October 25. Wimms was concerned because she had not heard from Delain all day despite it being Delain's due date. Police were called to the scene at approximately 7:40 p.m.

---

[1] Redd voluntarily dismisses Defendants Justinah McFadden and the John Doe "New York City Police Officers." See ECF 33 at 1.

Twenty-two days later, on November 17, 2008, Redd was arrested for the murder of Delain. On January 4, 2012, a Queens County jury convicted Redd of murder in the second degree and criminal abortion in the second degree. On July 6, 2016, the Appellate Division, Second Department overturned that conviction based on "pervasive prosecutorial misconduct." People v. Redd, 35 N.Y.S.3d 402, 404 (2d Dep't 2016). The Appellate Division found that the prosecutor improperly engaged in "misstating the evidence, vouching for the credibility of witnesses with regard to significant aspects of the People's case, calling for speculation by the jury, seeking to inflame the jury and arouse its sympathy, and improperly denigrating the defense." Id. While ordering a retrial, that decision also noted, "[v]iewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt of the charged crimes beyond a reasonable doubt and the verdict of guilt was not against the weight of the evidence." Id. (internal citations omitted).

Redd was retried and acquitted by a Queens County jury on April 4, 2018. Redd served more than nine years in prison before his acquittal.

This civil action names lead detective Edward Balfe; Detectives Billy Milan and Ronald Waldron, and Police Officer Fresnel, who each assisted in the investigation; the City of New York; and the New York Police Department as defendants. The Complaint alleges nine state and federal causes of action for false arrest, malicious prosecution, fabricating evidence, intentional infliction of emotional distress, abuse of process, denial of due process, and, on the part of the City, negligent hiring, training and supervision, and vicarious liability for the causes of action against the individual Defendants.

## LEGAL STANDARD

2

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

### A. False Arrest

We begin with Redd's state and federal claims for false arrest. The elements of a cause of action for false arrest under state law and under § 1983 are "substantially the same," Singer v. Fulton County Sheriff, 63 F.3d 118 (2d Cir.1995), and require Redd to show: (1) Defendants intended to confine Redd; (2) Redd was conscious of the confinement; (3) Redd did not consent to the confinement; and (4) the confinement was not otherwise justified, Maron v. Cnty. of Albany, 166 F. App'x 540, 541 (2d Cir. 2006).

The existence of probable cause is a complete defense to a false arrest claim because it establishes a justification for the arrest. See Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). When determining whether probable cause exists, courts "must consider those facts available to the officer at the time of the arrest and immediately before it." Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir.1996).

3

Moreover, even if the Defendants cannot demonstrate *actual* probable cause for Redd's arrest, if the undisputed facts support the less stringent standard of "arguable" probable cause, the individual defendants are protected against this suit by the doctrine of qualified immunity, which immunizes government officials against suits based on conduct that was not objectively unreasonable. See Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause exists where either (a) it was objectively reasonable for officers to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. Id. "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016).[2]

1. *Facts Supporting Probable Cause*

The investigation of Delain's murder yielded no blood, DNA, fingerprint evidence, murder weapon, surveillance footage, or eyewitness linking Redd, or anyone else, to the crime. Medical examiners were unable to estimate a time of death beyond the conclusion that it occurred at some point on October 25. Two pieces of circumstantial evidence, therefore, became critical to the decision to arrest Redd. First, on November 2, Delain's upstairs neighbor, Jinette Gerve, told Detective Milan that she had heard an argument between a man and woman in

---

[2] Figueroa elaborated further on the arguable cause standard:

> When a plaintiff alleges that a law enforcement officer's official conduct renders him personally liable in damages, our inquiry is not whether the officer should have acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the 'reasonable officer'—a creature akin to the 'reasonable man' of the law of torts . . . would have acted in the same way. It is instead whether any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful.

Delain's apartment on October 25 at approximately 5:45 a.m. during which a woman yelled "Stop Derrick!" ECF 34 ¶ 143. Detective Milan later testified that after hearing Gerve's account on November 2, he believed there was probable cause to arrest Redd. See ECF 33-30 at 94:14-17.

Second, on November 3, Detective Milan obtained cell site location data showing that between 3:34 a.m. to 5:21 a.m. on October 25, Redd's cell phone was communicating with a cell site tower located around the corner from Delain's apartment. Cell site data did not provide a location for Redd's phone between 5:21 a.m. and 7:50 a.m. Cell phone records also showed that Delain called Redd ten times between 1:32 a.m. and 2:30 a.m. on October 25. The 2:30 a.m. call from Delain to Redd was the last outgoing communication from her cellular phone.

Defendants point to additional pieces of circumstantial evidence discovered prior to Redd's arrest, which would be insufficient to establish probable cause standing alone, but nonetheless supported the inference that Redd murdered Delain. First, there were no signs of forced entry into Delain's apartment and Redd had a key. Second, while no DNA evidence connected Redd to the crime scene, Detective Balfe smelled a cleaning solution upon arrival at the scene. Opened bottles of bleach were later discovered by officers during a search of a vehicle belonging to Redd on November 4. Officers believed that Redd cleaned the crime scene with the cleaning solution found in his car. Third, detectives noticed three small, superficial cuts on Redd's hands, which they considered evidence of his involvement in the stabbing of Delain. Fourth, Redd's behavior surrounding Delain's death led Delain's mother, Ms. Wimms, to find him suspicious and to communicate those suspicions to officers. Specifically, on October 25, after Wimms reached out to Redd and asked him to check on Delain, Redd requested that Wimms accompany him to her apartment. This could suggest that Redd knew what would be

5

found at the scene and believed he would appear less culpable if he discovered the body with Wimms. In a similar vein, when it came time to call the police, Redd dialed 911 and handed the phone to Wimms. Wimms also observed that, upon discovering Delain's body, Redd did not say anything or react at all.

Detectives noted other suspicious behaviors on Redd's part. In his initial interview with detectives, Redd misrepresented his whereabouts on the early morning of October 25. He first told Detective Milan that he was not at or near Delain's apartment at any point on October 24 or 25, only to admit later that he was, in fact, parked on Delain's block during the early morning of October 25 because it was her due date. Redd explained that he did not initially come clean because he thought it would make him look suspicious.

Delain's cousin, Seretha Wimms, told detectives that Redd had previously been involved with three abortions and had no desire to be a father. Officers learned from witnesses and from text message evidence that Redd and Delain had a tumultuous relationship, involving fights about Redd's paternity and threats to expose one another's role in an insurance fraud scheme.

All of this information, known to detectives prior to Redd's arrest, indicates that there was at least arguable probable cause to arrest Redd. However, before reaching that conclusion, we address Redd's lengthy opposing brief, which seeks to undermine the strength of Defendants' probable cause determination.

    2. *Redd's Challenges to Probable Cause*

Redd does not dispute the facts that led to his November 17, 2008 arrest. Instead, he offers additional facts and contends that Defendants became laser-focused on his guilt while ignoring holes in the investigation.

6

Redd argues that detectives should have disregarded Gerve's statements to detectives on November 2 because she was an untrustworthy witness. It is undisputed that Gerve twice told detectives she had not heard anything from Delain's apartment on the day of the murder, before finally telling detectives in their third conversation that she had heard the "Stop, Derrick" dispute in the apartment below. But during her November 2nd interview, Gerve provided detectives with an explanation for initially denying she had heard anything: she was scared to speak to law enforcement based on a past experience in which a defendant threatened her after she testified in court, and Redd had given her a "creepy" look on the evening of October 26. ECF 34 ¶ 147. In the Court's view of the record, the detectives' decision to credit Gerve's account was not unreasonable, particularly after they learned the corroborating fact that Redd's cell phone was in the vicinity of Delain's apartment at roughly the same time Gerve purported to have heard "Stop, Derrick."

Redd's next challenge to probable cause relates to Delain's time of death. Redd posits that Delain actually died in the afternoon of October 25, when Redd had an alibi, rather than in the early morning. Redd's submits that an investigator from the Officer of the Chief Medical Examiner who arrived at the scene, Amy Donaldson, "estimate[ed] the time of death at 2pm." ECF 33 at 30.[3] But Donaldson's report did not contain any estimated time of death. Nor did the autopsy report performed on October 26 by Dr. Marianne Hamel. Instead, Redd's 2:00 p.m. time

---

[3] Redd also cites the testimony of the chief medical examiner, Dr. Marianne Hamel, who performed an autopsy and testified at Redd's first trial that she, "found nothing in my autopsy that would be consistent with the time of death of 6am." ECF 35-5 at 71. But Hamel testified in Redd's second trial that the court reporter in the first trial had misquoted her and that her testimony was, in fact, that nothing in her autopsy was *inconsistent* with a 6:00 a.m. time of death. See ECF 33-25 at 561:19-24.

7

of death estimate derives from his own calculations using information contained in Donaldson's report, including Delain's body temperature and rigor mortis grade. See ECF 35-5 ¶ 71.[4]

The existence of probable cause hinges on "facts available to the officer at the time of the arrest and immediately before it." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted). Redd does not contend that, before his arrest, detectives knew or should have known of any conclusive time of death estimate, based on the raw data in Donaldson's report or any other source. Redd cannot now paper over the lack of any contemporaneous time of death estimate by playing medical examiner fourteen years after the fact.

Redd persists in further support of an afternoon time of death, presenting evidence that a data session on Delain's cellular phone was initiated at 2:10 p.m. on October 25. He argues that the cellphone data session—which indicates that the internet was accessed from the phone—establishes that Delain was alive at that point in time.[5] The government counters, citing the trial testimony of a manager from the Law Enforcement Relations Group at T-Mobile, that such a data transaction could have been initiated as part of an automated process, like an automatic update. See ECF 35-5 ¶ 49.

---

[4] Redd also insists that Delain must have died on the afternoon of October 25 because Dr. Hamel testified that she could only "predict the time of death within a twenty-four hour period from the time she conducted the autopsy," which was done at 11:30 a.m. on October 26, thus ruling out an early morning October 25 time of death. ECF 33 at 56. But Redd misquotes Dr. Hamel, who actually testified that she estimated Delain's time of death to be within 24 hours before "Delain was *discovered*." ECF 33-13 at 1629:7-8 (emphasis added). Delain was discovered on the evening of October 25th. An early morning time of death on October 25 is well within the 24-hour window identified by Dr. Hamel.

[5] It appears from the parties' submissions that nothing about the data session – i.e., how the internet may have been used – is known or knowable beyond its existence.

While this issue constitutes a dispute of fact, it is not a material one. First, while Redd cites the opinion of his expert on the significance of the data session, he never establishes what was known, or should have been known, about the data session prior to Redd's arrest in 2008. Second, the fact that Redd's interpretation of the data session now requires the explication of an expert undermines the argument that a reasonable detective should have looked for this information and determined it to be exculpatory. Third, the significance of the data session is, at best, ambiguous—nothing in the record establishes that the data session must have been initiated manually. To undermine arguable probable cause, the 2:10 p.m. data session would need to be so exculpatory that no reasonable officer could conclude, after learning of it, that probable cause to arrest Redd existed. See Figueroa, 825 F.3d at 89 (arguable probable cause asks "whether *any reasonable officer*, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful") (emphasis added). Given the totality of the inculpatory evidence, that proposition is simply untenable; reasonable officers could disagree as to the existence of probable cause, regardless of the afternoon data session on Delain's cell phone.

Redd also asserts that Defendants ignored leads with respect to other known paramours of Delain. But none of the evidence regarding the purported paramours tends to nullify a probable cause determination as to Redd or even links Delain's other romantic interests to the crime. Even if these paramours could be considered leads by virtue of their relationship to Delain, probable cause does not require detectives to "pursue every lead to ensure they were correct; if they reasonably believed they had amassed enough facts to believe probable cause existed, they were free to arrest" Redd. Seitz v. DeQuarto, 777 F. Supp. 2d 492, 503 (S.D.N.Y. 2011).

Admittedly, the case against Redd was far from airtight. Given the lack of forensic evidence connecting Redd—or anyone else—to the crime, as well as uncertainty as to witness credibility, the time of death, and Redd's whereabouts during the relevant period, it is not surprising that Redd's second trial ended in an acquittal. But probable cause does not require an airtight case or a guarantee of conviction. See Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003) ("Probable cause does not require absolute certainty."). At a minimum, the deferential standard of arguable probable cause has been satisfied by Defendants and qualified immunity is therefore triggered. Redd has not raised any disputes of material fact to show that "no reasonable officer could have determined that probable cause existed to arrest" Redd for Delain's murder. Triolo v. Nassau Cnty., 24 F.4th 98, 105 (2d Cir. 2022). The Court finds the opposite to be true: between the location of Redd's cellphone in relatively close proximity to a witness hearing someone in Delain's apartment yell "Stop, Derrick," the fact that Redd had a key to the apartment, was in possession of cleaning solution, and arguably had a motive, a reasonable officer could have concluded, based on the totality of the information available at the time of the arrest, that Redd killed Delain. The Court grants Defendants' motion for summary judgment on Redd's false arrest claims.

### B. Malicious Prosecution

We turn to Redd's malicious prosecution claims under New York law and § 1983. Redd submits that a reasonable factfinder could conclude that Defendants' singular focus on his guilt constituted a "wrong or improper motive, something other than a desire to see the ends of justice served," sufficient to establish that he was prosecuted maliciously. Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996), as amended (May 21, 1996) (internal citations and quotation marks omitted).

Redd's state and federal malicious prosecution claims require him to establish: (1) the commencement or continuation of a criminal proceeding by Defendants against him; (2) the termination of the proceeding in favor of Redd; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice. Kee v. City of New York, 12 F. 4th 150, 161-62 (2d Cir. 2021).[6] While police officers do not generally commence or continue criminal proceedings themselves, a claim for malicious prosecution can still be maintained against a police officer or detective "if the officer is found to play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Bermudez v. City of New York, 790 F.3d 368, 377 (2d Cir. 2015) (cleaned up).

Qualified immunity protects officers from malicious prosecution claims where arguable probable cause is "continuing," such that no intervening facts emerge to establish the defendant's innocence between the time of arrest and the initiation or continuation of criminal proceedings. See Betts, 751 F.3d at 82. We have already concluded at a minimum that arguable probable cause supported the arrest of Redd. There are no material disputes of fact as to any intervening facts between the time of Redd's arrest and the initiation of criminal proceedings against him that might have established his innocence and nullified probable cause. Moreover, a grand jury returned an indictment against Redd. And under New York law, a grand jury indictment creates a rebuttable presumption of probable cause,[7] which may only be rebutted through evidence from

---

[6] "The merits of a claim for malicious prosecution under [Section] 1983 are governed by state law." Dufort v. City of New York, 874 F.3d 338, 350 (2d Cir. 2017).

[7] The presumption of probable cause created by a grand jury indictment does not apply to the tort of false arrest. See Savino, 331 F.3d at 75 (citing Broughton v. State, 37 N.Y.2d 451, 456 (1975)).

which a reasonable jury could find that the indictment was procured by fraud, perjury, the suppression of evidence, or other bad faith police conduct. See Savino, 331 F.3d at 72-73.

Redd offers two arguments to rebut the presumption of probable cause. First, he submits that Defendants supplied the grand jury with false information via the testimony of Wimms, Delain's mother, who Redd asserts mischaracterized her relationship with Redd to the grand jury by exaggerating the amount of time she had known Redd and testified that she believed Redd was guilty of Delain's murder. Redd also accuses Defendants of misleading the grand jury because the grand jury was not presented with testimony to confirm whether Gerve's witness account was consistent with Delain's time of death.

But testimony at the grand jury stage does not demonstrate bad faith on the part of the individual Defendants. No prosecutors are named in this action; the Defendants had no control over who testified. See Jorgensen v. Cnty. of Suffolk, 558 F. Supp. 3d 51, 63 (E.D.N.Y. 2021) (in a malicious prosecution action against officers, the "'intervening exercise of independent judgment' by a prosecutor usually breaks the 'chain of causation' unless the plaintiff can show the prosecutor was 'misled or pressured' by an officer." (quoting Dufort v. City of New York, 874 F.3d 338, 352-53 (2d Cir. 2017))).

Redd also argues that Detective Balfe withheld information from prosecutors. He contends that Defendants failed to advise the prosecution that "Redd was nowhere near the crime scene at the estimated time of death [and] that the only witness' timeline and account was directly contradicted by multiple pieces of evidence." ECF 33 at 75. He also points to the fact that officers never documented an interview with Shaqira Pollard, who provided an alibi for Redd on the afternoon of October 25. Redd contends that a reasonable factfinder could conclude that police withheld this information because it "would provide definitive proof that the plaintiff

was nowhere near the scene at the estimated time of death." Id. As an initial matter, Redd provides no evidence, except for the lack of a Dd5[8] documenting the interview with Pollard, that this information was withheld from prosecutors. But even if he did, Redd's location on the afternoon of October 25 has no exculpatory value. As Defendants point out, no one disputes that Redd was away from the crime scene on the afternoon of October 25 and had an alibi. Redd's location on that afternoon does not undermine the theory of the prosecution: that Redd killed Delain in the early morning of October 25. Even assuming that information was not shared with prosecutors, it is not evidence of bad faith or the suppression of evidence.

Redd also states that Detective Balfe withheld from prosecutors the fact that "the only witness had lied to police on multiple occasions." ECF 33 at 75. Once again, Redd provides no evidence that this information was withheld from prosecutors. Indeed, Redd's claim appears to be undermined by Gerve's contradictory statements appearing in Dd5 forms. See ECF 33-28 at 13, 60. Redd's speculation on this issue does not create a triable issue of fact.

In sum, Redd has not supported his malicious prosecution claim with any evidence from which a reasonable factfinder could conclude that Defendants mislead prosecutors by engaging in fraud, bad faith, or the suppression of evidence. Defendants are therefore entitled to qualified immunity—and summary judgment—on Redd's malicious prosecution claims.

### C. Fabrication of Evidence

Redd next argues that he was denied a fair trial because "a reasonable fact finder could conclude that Jinnette Gerve's incredible statement was fabricated by Milan and Waldron." ECF 33 at 76. The parties agree that to prevail on this claim, Redd must demonstrate that an

---

[8] While there is no Dd5 documentation of an interview with Shaquira Pollard, Redd mentioned that he was with her on the afternoon of October 25 during his interview with Detective Balfe on the evening of October 25. That interview is documented in a Dd5. See ECF 33-28 at 23.

investigating official fabricated evidence that was likely to influence the jury's decision, forwarded that information to prosecutors, and that Redd suffered a deprivation of liberty as a result. Ashley v. City of New York, 992 F.3d 128, 139 (2d Cir. 2021). The survival of this claim hinges on the question of whether a reasonable factfinder could find that Defendants fabricated evidence against Redd. We conclude that one could not.

Redd posits that Defendants induced Gerve's statement about a dispute in Delain's apartment by offering an "exorbitant package" of benefits. ECF 33 at 237. Redd fails to introduce any evidence beyond his own speculation sufficient to allow a reasonable factfinder to agree with that assertion. Redd does cite a Stipulation of Benefits, which reflects that the District Attorney paid for Gerve to relocate to a new apartment and wrote a letter on Gerve's behalf to the United States Customs and Immigration Service. But that document relates to actions taken by the District Attorney's office, not any Defendant in this case. The benefits were conferred in 2009 and 2010, more than a year after Gerve told detectives she had heard a dispute in the apartment below; the agreement pertained to Gerve's trial testimony and status as a cooperating witness, not any statement she made to detectives. On this record, no reasonable juror could infer that Defendants induced Gerve to fabricate her witness account. There are certainly questions about Gerve's reliability as a witness and a jury could readily conclude that she was not credible. But a witness's inconsistent statements do not amount to fabricated evidence. Defendants' motion for summary judgment is granted as to Redd's claims that Defendants denied him a fair trial through the fabrication of evidence.

D. **Claims Against New York City**

We turn next to Redd's claims against the City. "In order to impose § 1983 liability upon a municipality or municipal agency, a plaintiff must demonstrate that any constitutional harm

14

suffered was the result of a municipal policy or custom." Sorlucco v. New York City Police Dept., 971 F.2d 864, 870 (2d Cir.1992) (citing Monell v. Department of Social Services, 436 U.S. 658 (1978)).

Redd's complaint recites various conclusory statements about NYPD policies. See e.g., ECF 1 ¶ 85 (accusing NYPD of "implement[ing] plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline"). But now, with the benefit of discovery, Redd does not elaborate on, or even address, his Monell claims in response to Defendants' Motion for Summary Judgment. Without any meat on his barebones assertions about NYPD policies, Redd's Monell claims cannot survive. See Sarus v. Rotundo, 831 F.2d 397, 402 (2d Cir. 1987) (reversing jury verdict on Monell claim where none of the relevant evidence related to a policy or practice). Summary judgment on Redd's claims against the City is granted.[9]

### E. Abandoned Claims and Defendants

Finally, in opposing summary judgment, Redd fails to elaborate on three of his nine causes of action: intentional infliction of emotional distress, abuse of process, and negligent hiring, firing, and training. Redd neglects to address these claims notwithstanding Defendants' request that Redd identify the claims "which he believes can survive summary judgment [and]

---

[9] We note, for the avoidance of doubt, that Redd's Complaint pleads a state law vicarious liability cause of action against the City for the constitutional violations and torts of the individual defendants. While New York law permits suits against municipalities for "common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*," L.B. v. Town of Chester, 232 F.Supp.2d 227, 239 (S.D.N.Y.2002), the Court has granted summary judgment for the individual defendants on those claims. Redd therefore may not maintain a claim against the City on a theory of *respondeat superior*.

based upon what evidence." ECF 32 at 31. These claims are therefore dismissed based on Redd's failure to identify any triable issues of fact.

The Court dismisses Defendant Fresnel from the case (or the case caption, which is the only mention of Fresnel by either party at the summary judgment stage). Redd has not connected Fresnel with any cause of action and Redd does not address Fresnel in opposing summary judgment. Similarly, Redd lists the New York City Police Department as a defendant, but does not include it in any cause of action. Moreover, it is well established that the New York City Police Department is not a separate legal entity from the City and cannot sue or be sued. See Escobar v. City of New York, No. 05-CV-3030, 2007 WL 1827414, at *4 (E.D.N.Y. June 25, 2007). The NYPD is dismissed from the case.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in its entirety.

SO ORDERED.

Dated: Brooklyn, NY  /s/ Raymond J. Dearie
      December 30, 2022  RAYMOND J. DEARIE
                            United States District Judge